Filed 10/26/15

# IN THE SUPREME COURT OF CALIFORNIA

| | | |
|---|---|---|
| THE PEOPLE, | ) | |
| | ) | |
| Plaintiff and Respondent, | ) | |
| | ) | S152737 |
| v. | ) | |
| | ) | |
| JOSEPH SEFERINO CORDOVA, | ) | |
| | ) | Contra Costa County |
| Defendant and Appellant. | ) | Super. Ct. No. 05-040292-5 |
| _____ | ) | |

A jury convicted defendant of the first degree murder of Cannie Bullock and found true the special circumstance allegations of murder while committing rape and murder while committing a lewd and lascivious act on a child under the age of 14. (Pen. Code, §§ 187, 190.2, subd. (a)(17)(C) and (E).)[1] After a penalty trial, the jury returned a verdict of death. The court denied the automatic motion to modify the verdict (§ 190.4) and imposed that sentence. This appeal is automatic. (§ 1239, subd. (b).) We affirm the judgment.

## I. THE FACTS

### A. Guilt Phase

#### 1. Overview

In 1979, eight-year-old Cannie Bullock's strangled and sexually abused body was found in the backyard of her home. Although investigators suspected a

---

[1] All further statutory citations are to the Penal Code unless otherwise indicated.

1

neighbor, William Flores, might have committed the crime, Flores was not charged, and the case was unsolved. A few years later, Flores committed suicide. In 1996, Flores's body was exhumed. Deoxyribonucleic acid (DNA) from his body was compared to evidence samples from the victim's body using recently developed methods of DNA analysis. The body's DNA did not match DNA from the evidence samples, and the case remained unsolved.

Finally, in 2002, a "cold hit" connected defendant, then living in Colorado, with the crime. Further testing established that sperm and semen found in the victim's body had come from defendant, and investigation revealed that, around the time of the crime, he had lived near the victim's home and had had a sexual relationship with her mother. He was charged with the child's murder.

At trial, defendant did not dispute that the sperm and semen in the body had come from him, but he proffered an innocent explanation for this circumstance, namely, that semen from sexual intercourse he had had with the mother had transferred onto the child. He contended Flores committed the crime.

2. *Prosecution Evidence*

In August 1979, Cannie Bullock (Cannie) lived in a small house on Dover Street in San Pablo with her mother, Linda Bullock (Linda). The house had one bedroom and a sofa bed in the front room. Linda's friend, Debbie Fisher, was also staying in the house.[2] Fisher described Cannie as friendly toward persons she knew. The evening of Friday, August 24, 1979, between 11:00 and 11:30 p.m., Linda and Fisher went to Oscar's bar on 23rd Street in San Pablo, leaving Cannie

---

[2]    Both Linda and Fisher testified at trial. Some of their statements to police shortly after the crime were also admitted into evidence as past recollection recorded. (Evid. Code, § 1237.) This summary of their testimony includes these statements.

alone in the house. When they left, Cannie was on the sofa bed watching television. She had just taken a bath and was wearing a bathrobe. Linda locked the front door and told Cannie not to open it for anyone.

Linda and Fisher returned to the house between 2:00 and 3:00 a.m. the next morning, with Fisher arriving sometime after Linda. Linda observed that the front gate was unlatched and the front door was unlocked. She could not find Cannie, but saw her bloody bathrobe on the front room floor. When Fisher arrived home, she heard Linda screaming that she could not find Cannie. The police later found Cannie's body in the backyard covered by a bedspread. It appeared it had been dragged there from someplace else. There was no sign of a forced entry into the house, and it appeared the front door had been unlocked from the inside.

Fisher observed a Sears sewing machine manual and a Sagittarius zodiac sign pendant on the coffee table in the front room; they had not been there previously. She gave them to the police.

Dr. George Bolduc performed the autopsy. In his opinion, the cause of death was "asphyxiation secondary to strangulation." The child was most likely manually strangled. Dr. Bolduc also observed physical evidence that the victim had been sexually assaulted. Dr. Bolduc collected evidence samples from her vagina and rectum, including a "deep vaginal swab."

During the initial investigation, the investigators considered a neighbor, William Flores, who showed a great interest in the case, to be a suspect, but they did not arrest him. Flores committed suicide in 1983. Neither Linda nor Fisher mentioned defendant to the investigators, and he was otherwise unknown to them. Present-day methods of DNA testing did not then exist, and the case was unsolved.

In 1996, investigators reopened the case in light of recent advances in DNA testing. They exhumed Flores's body to compare DNA taken from the body with

3

DNA in evidence samples taken from the victim's body. Because the Contra Costa County crime laboratory did not perform DNA testing at the time, the samples were sent to Cellmark Diagnostics, a private company, to test. The samples did not match, meaning that Flores could not have been the source of the evidence samples.

Thus, the case remained unsolved. Later, investigators placed the DNA profile of the evidence samples into a national data bank. In 2002, investigators were informed that defendant, living in Colorado, might be connected to the case. The police reopened the investigation.

In July 2002, Detective Mike von Millanich interviewed defendant in Colorado. Pursuant to a court order, he also obtained a sample of defendant's blood for future testing. The videotaped interview was played to the jury. Defendant said that in 1979 he had been living in San Pablo and often went to bars on 23rd Street in San Pablo, including Oscar's bar. He left San Pablo to go to Canada in October 1979 and later moved to Colorado. He remembered Linda and Fisher, who used to live on Dover. He also "vaguely" remembered Linda's daughter. When Detective von Millanich told him his DNA had been found in the daughter's body, he said, "I don't know how that can be." He said that one Friday night, he picked Linda up at a bar and took her home and then "to bed." He left her the next morning and did not see her again. He did not remember what Friday it was, but he did remember hearing about Linda's daughter's death on a Saturday or Sunday. He denied being the killer.

Later, at Detective von Millanich's request, a Colorado investigator interviewed defendant, and showed him a picture of the pendant found at the crime scene. The videotaped statement was later played for the jury. When shown the pendant, defendant said, "I've seen it before, yeah. Sagittarius." But he denied owning or wearing a pendant like it. He said he did not wear jewelry or anything

4

around his neck. He said he had seen pendants like it "in stores and stuff." He reiterated that he had been at Linda's house and had sex with her one Friday night after meeting her at a bar. The daughter was in another room at the time. He saw the daughter the next morning before he went to work. When asked how his semen could have been found inside the daughter, he responded, "I imagine I left some on the sheets in the bed there."

Linda testified that in 1979 she had sometimes had sex with male visitors, always in her bedroom. Cannie never came into the bedroom when she was having sex and never got into bed with her afterwards. Linda did not remember defendant. She testified, and had previously told the police, that she had not had sex the night Cannie died or the night before that. She further testified that no one had been to her house the week before the killing. Investigators testified that when they responded to the house the night of the killing, Linda's bed was neat and undisturbed.

Fisher testified that Linda had had frequent male visitors, and that Cannie would typically meet them. "[T]hey would sit down before they'd go off into the bedroom and visit a few minutes." Linda never used the sofa bed. If Fisher was home when Linda brought a male visitor home, she and Cannie "would get on our bicycles and take off, ride around." Fisher also testified that she had met defendant at Linda's house a "couple" of times. Linda and defendant entered the back bedroom together. Cannie had also met defendant.

A former San Pablo police officer testified that in the 1970's he sometimes saw defendant "in some of the local drinking establishments in San Pablo."

Cynthia Sumundal Born, who had a substantial criminal record and was facing criminal charges at the time of trial, testified that Linda and defendant "hung out quite a bit together" at a local bar. In the late 1970's, defendant wore the pendant found at the crime scene "around his neck all the time." Defendant's

5

sister, Vicki Cordova, testified that she had never seen the pendant. Previously, she had told an investigator that she remembered defendant wearing something around his neck, although she could not remember what it was.

Beginning in 2002, the evidence samples taken from the victim's body, including the deep vaginal swab and a rectal swab, were tested several times by both the Contra Costa County crime laboratory and Forensic Science Associates, a private company in Richmond. The nonsperm component of the samples matched the victim's DNA. DNA from sperm in the samples matched DNA from defendant's blood.

Criminalist David Stockwell of the Contra Costa County crime laboratory testified that his testing established the DNA profile of the sperm in the evidence samples would occur among unrelated individuals in about one in 3.1 quintillion African-Americans, one in 670 quadrillion Caucasians, and one in 3.6 quintillion Hispanics. A quintillion is a billion billions; a quadrillion is a million billions. These numbers are "[s]omewhere between a million- and a billion-fold beyond" the number of people on Earth. Based on these figures, Stockwell testified that, assuming a population of unrelated individuals, in his opinion and "to a reasonable scientific certainty," defendant was the source of the sperm in the evidence samples.

Forensic Serologists C. Alan Keel (Keel) and Dr. Edward Blake of Forensic Science Associates both testified regarding their testing of the evidence samples. Dr. Blake testified that the rectal and vaginal swabs contained the same sperm source, and that defendant's genetic profile matched the profile of the sperm in the evidence samples. That profile would occur among about one out of 134 billion trillion Caucasians, one out of a trillion trillion African-Americans, and one out of 13 billion trillion Mexican-Americans. Given these numbers, in his opinion, this profile "is expected to be unique in the human population," but he preferred to

6

leave it to the jury to decide whether this meant that defendant was the source of the sperm in the samples.

Dr. Charlotte Word, who testified about Cellmark Diagnostics's 1996 testing of evidence samples that eliminated Flores as a possible source, also testified that the samples contained a "large amount" of sperm, which indicated that it was "probably from a fresh ejaculate that is pretty much undiluted.  This is a lot of sperm, and this would be the type of pattern we would see from a fresh sperm deposit that wasn't diluted and was collected in a few hours, for instance, from the time of deposition or certainly deposited in a place where the amount of sperm could not decrease over a period of time."  In her opinion, the amount of sperm was not consistent with a person who had spent at least 24 hours dressed and moving about and had taken a bath or shower before the samples were taken. She explained that "[s]amples collected 24 hours after deposition of sperm frequently have sperm, but it's very, very low level.  The normal process of just moving and cleansing of the vaginal cavity removes a large number of the sperm in that period of time, and this is not what I would expect to see after deposition of sperm in a normal healthy female that was walking around doing . . . general lifestyle."

Stockwell testified that many of the individual sperm in the samples he examined still had their tails attached, which meant the sperm had been present in the samples only a short time.  He explained that "[s]perm have a very fragile tail to them.  In order to conduct what their intended purpose is they have to move. During the course of movement they oftentimes become attached to cells or other obstructions in their path, and in their attempt to try and move on, many times the tail will break off."  In his experience, "anywhere between 8 and 10 hours would be about the maximum with which I would expect to be able to find sperm with tails vaginally on a living human female."  Sperm can keep their tails longer in a

7

dead body. The results he saw were "consistent with fresh ejaculation into a dead or dying body" within a "time course of hours." In response to hypothetical questions, he opined that the samples he observed could not have transferred from someone else into a child who had spent a day engaging in normal activity and had taken a bath or shower before the samples were taken. Instead, both the amount and condition of the sperm were consistent with a victim who was raped and strangled to death, and the perpetrator had "ejaculated into her body cavity at or near the time she died."

Keel testified that the vaginal and rectal samples he tested contained a "very large number" of sperm, which indicated that the sperm were "part of a neat ejaculate." The samples contained "essentially neat semen," meaning it was "undiluted or basically straight out of the penis."

Dr. Blake testified that the sperm levels in the vaginal and rectal swabs "are objectively very large, and that's the kind of result that you expect from a short post-coital interval." It was the type of result he "would expect from ejaculation into the vaginal cavity and the victim then not moving after that and at some point later that material being" collected. In response to a hypothetical question, he found the possibility that the samples he examined could have transferred into the body from ejaculation onto a sheet not to be a "plausible scenario." In his opinion, "the most reasonable explanation for the presence of the sperm in the amount and the condition you discovered would be ejaculation into the vaginal cavity and collection shortly thereafter by the pathologist on the swabs."

Nina S. testified that in September 1992, when she was 12 years old, defendant and his wife were babysitting her and her brother in Colorado. During the middle of the night, defendant woke her. "He was rubbing my chest and my butt." For this incident, defendant was convicted of a Colorado crime "commonly known as criminal attempt sexual assault on a child."

8

Curtis B. testified that in November 1997, when he was 10 years old, he attended a party in Colorado and eventually went to bed in an upstairs bedroom. Defendant woke him up. "He was rubbing my back, and he had his — put his hand down the back of my boxers." He was "rubbing" "my butt." For this incident, defendant was convicted of a Colorado crime "commonly known as sexual assault on a child."

### 3. Defense Evidence

Through cross-examining prosecution witnesses and presenting his own witnesses, defendant sought to raise a reasonable doubt that he committed the crime. Primarily, he presented two types of evidence: (1) evidence suggesting an innocent explanation for his sperm being in the victim's body; and (2) evidence suggesting that Flores, the original suspect, had committed the crime.

Keith Inman, a forensic scientist with Forensic Analytical Sciences, Inc., examined some of the evidence in this case. His testing confirmed that the nonsperm component of the samples from the body was consistent with the victim's DNA and the sperm component with defendant's. He also agreed the samples contained a large amount of sperm. But he testified the sperm could have been transferred into the body from a separate ejaculation, i.e., from sexual intercourse defendant had engaged in with Linda. He testified that, for this to be done, three "essential pieces . . . would have to be present." First, there would have to be a "neat semen sample," meaning "basically undiluted ejaculate." Second, the semen "would have to be on an item that would remain moist and then would come in contact with the genital area of the victim." Third, there would have to be "no mechanism that would serve to somehow remove the semen that . . . had been deposited in the genital area." In Inman's opinion, the fact many of the sperm had intact tails did not refute the transfer possibility.

Inman concluded his direct examination by stating that "the tests that I run don't easily distinguish between those two possibilities . . . that we've been considering, transfer unrelated to the event and vaginal ejaculation, and ultimately it's going to be the circumstances of the case that decide which of those is more reasonable or not. So certainly nothing that I have found would refute really either hypothesis." On cross-examination, Inman testified that, although his tests of the evidence did not refute the transfer hypothesis, the circumstances of the case could do so. A child's normal activity would tend to remove any transferred semen and bathing would be a "big" mechanical activity in removing the semen.

Brent Turvey, a forensic scientist, testified that, in his opinion, "secondary transfer" was a "reasonable theory." The secondary transfer would have occurred before the samples were collected and would have been caused by "an ejaculation outside of a female body." He had no expertise regarding whether the samples contained a large amount of sperm and, if they did, the significance of this circumstance.

Defendant presented evidence tending to connect Flores with the sewing machine manual Fisher found in the house after the crime, statements Flores made to police shortly after the crime, and statements Flores's sister made to police in 1996 regarding what Flores's mother had told her shortly after the crime in 1979. In 1996, the sister said her mother had said Flores had come home the night of the killing (or a week before, the statement was ambiguous) wearing a bloody shirt caused, Flores told the mother, by a fight. The mother said she burned the shirt in an incinerator. The mother also mentioned a suicide note Flores had left when he committed suicide that said he "was sorry for what he did." The mother had said nothing indicating what Flores was sorry for. The sister also told police that years before the killing, Flores tried to touch her vagina.

Flores's sister testified at trial. She remembered neither her mother saying these things to her nor her making the statements to the police. She said that if she did make the statements, she was "being a mouthy person that I am." She had not gotten along with her brother. She doubted that her mother had said anything about a bloody shirt because if she had, she (the sister) would have called the police at that time (1979) with the information. She also doubted that her mother would have burned the shirt in an incinerator. Her mother had told her there was no suicide note. She, the sister, had never seen one. Other than the sister's 1996 statement to police regarding what the mother had said in 1979, there was no evidence a suicide note had ever existed.

### B. Penalty Phase

#### 1. *Prosecution Evidence*

Cannie's mother and a paternal uncle testified about her and the impact her death had on them and Cannie's father.

Defendant was convicted of forgery in 1970. In April 1977, defendant was convicted of possession of a sawed-off shotgun. In February 1982, defendant fired a rifle inside his Colorado apartment in order, he told police, to scare his girlfriend. In 1994, he was convicted in Colorado of resisting arrest, misdemeanor "menacing," and third degree assault, crimes involving his wife, Kelly Cordova.

#### 2. *Defense Evidence*

Defendant's older brother, Abe Cordova, presented a videotape and testimony regarding defendant's childhood in Colorado and his good qualities. Their father was a coal miner and local deputy sheriff, and the family had a "good life." Defendant had a "wholesome, uneventful childhood." Based on his knowledge of defendant, Abe testified that he "can't believe" defendant committed the crime in this case.

11

Defendant's sister-in-law (Abe's wife), one of his sons, two of his sisters, his current wife, a former wife, a former girlfriend, a longtime friend and former brother-in-law, and a former roommate all testified about defendant and his good qualities. Some testified that his experiences in the military, including service in Vietnam, had changed him. They generally said he was a good father to his children, worked hard, and generally acted appropriately, including around women. Some could not believe he committed the crime in this case.

Defendant testified. He denied murdering Cannie but said he was not angry at the jury for its verdict. He did not "know if they based their decision on evidence or if they took the crime itself as such a bad crime that they wanted to punish somebody." He also denied molesting either of the two children in Colorado, saying that his convictions in those cases were mistakes on the part of the criminal justice system. He was essentially forced to plead guilty both times. He testified he had been in the Navy from 1962 to 1970 and served twice in Vietnam, where he was sometimes shot at although never wounded. His experiences in the Navy and Vietnam changed him and led to more drinking and drug use, although he was not an addict. He had no opinion regarding what punishment the jury should choose, although he believed he would be safer on death row than with the general inmate population. He did not believe he would ever actually be executed if he received the death penalty.

James Esten, a retired California correctional officer, testified about the conditions of confinement a convicted child murderer might expect. He also reviewed defendant's prison records. In his opinion, defendant's behavior while incarcerated has "been above average," although not "perfect." "There's nothing here that indicates that he is of an aggressive nature or that he is a predatory inmate."

12

## II. DISCUSSION

### A. Issues Relating to Guilt

#### 1. Delay in Bringing Charges

Before trial, defendant moved to dismiss the case because of the delay in bringing the charges against him. He contended the investigators were negligent in not charging him sooner, and the delay prejudiced him. After hearing evidence, the court denied the motion. Defendant contends the court erred.

#### a. Factual Background

At the hearing on the motion to dismiss, the prosecutor represented without contradiction that the authorities in Colorado submitted defendant's DNA profile to a national data bank on March 26, 2001; the local authorities submitted the evidentiary profile in this case to the data bank on March 18, 2002; and the local authorities learned of the DNA match implicating defendant on May 23, 2002. That was the first time investigators in this case had ever heard of defendant. The initial complaint against defendant was filed on December 3, 2002.

Based on the pleadings, the court found that defendant had not shown substantial prejudice. At defendant's request, it also heard testimony regarding whether the original investigation was conducted negligently.

Detectives Richard Bentley and Charles Bennett, the original investigators into Cannie's murder, testified at the hearing. They believed from the beginning that the perpetrator was probably someone known to Cannie, probably through her mother, Linda, or Debbie Fisher, who had been living with them. They interviewed both Linda and Fisher and asked them to provide names of persons who had recently been at the house. Neither gave them defendant's name, although Detective Bennett suspected Linda of withholding information. They interviewed neighbors regarding who might have been in the area, and

13

investigated two possible suspects whose identity they did learn of, including William Flores. Another officer interviewed the bartender at the bar where Linda had been before the murder. During their investigation, defendant's name did not arise, nor did they obtain any other information concerning him.

After hearing the testimony, the court denied the motion to dismiss. It found that there was no showing of negligence in the original investigation and that, even if it assumed there had been some negligence, it was "pure speculation that had it been done differently, it would have . . . led to the discovery of Mr. Cordova, or . . . that it would have led to the production of information sufficient to charge him with the crime." It found that the evidence needed to charge him was reasonably not discovered until 2002.

### b. Analysis

*People v. Nelson* (2008) 43 Cal.4th 1242 (*Nelson*) involved similar facts. The murder in that case occurred in 1976, three years earlier than the murder here. The defendant in *Nelson* was originally suspected of the murder, but the case was not solved until a cold hit revealed a match between the defendant's DNA and evidence in the case. As in this case, the match was discovered and the defendant was charged with the murder in 2002. (*Id.* at pp. 1248-1249, 1256.) In neither *Nelson* nor this case did the defendant deny that the state "prosecuted defendant reasonably promptly after it obtained the DNA evidence." (*Id.* at p. 1250.) Rather, like here, Nelson claimed the delay between the crime and the discovery of the DNA match violated his state and federal constitutional rights to a fair trial and due process "because the delay was unjustified and prejudiced his defense." (*Id.* at p. 1249.)

We stated the applicable law. "Defendant's state and federal constitutional speedy trial rights (U.S. Const., 6th Amend.; Cal. Const., art. I, § 15, cl. 1) are not

14

implicated in this case. Neither applies until at least the defendant has been arrested or a charging document has been filed. [Citation.] Defendant was not charged with or arrested for this murder until 2002, so his speedy trial rights did not attach until that time. He does not complain of delay after that time.

"Defendant complains only of delay between the murder and the time the state first charged him with the crime (hereafter sometimes referred to as precharging delay). Although precharging delay does not implicate speedy trial rights, a defendant is not without recourse if the delay is unjustified and prejudicial. . . . '[D]elay in prosecution that occurs before the accused is arrested or the complaint is filed may constitute a denial of the right to a fair trial and due process of law under the state and federal Constitutions. A defendant seeking to dismiss a charge on this ground must demonstrate prejudice arising from the delay. The prosecution may offer justification for the delay, and the court considering a motion to dismiss balances the harm to the defendant against the justification for the delay.' [Citation.]" (*Nelson*, *supra*, 43 Cal.4th at p. 1250.)

Noting that there is no statute of limitations for murder, we rejected the argument that when the delay is as long as it was here, prejudice is presumed. "To avoid murder charges due to delay, the defendant must affirmatively show prejudice." (*Nelson*, *supra*, 43 Cal.4th at p. 1250.) Regarding the exact standard, we applied California law because that law "is at least as favorable for defendant in this regard as the law under the United States Constitution." (*Id*. at p. 1251.) We considered whether, under California law, only purposeful delay can violate due process and concluded the constitutional right is not so narrow. We held that "under California law, negligent, as well as purposeful, delay in bringing charges may, when accompanied by a showing of prejudice, violate due process." (*Id*. at p. 1255.) However, "whether the delay was negligent or purposeful is relevant to the balancing process. Purposeful delay to gain an advantage is totally unjustified,

15

and a relatively weak showing of prejudice would suffice to tip the scales towards finding a due process violation. If the delay was merely negligent, a greater showing of prejudice would be required to establish a due process violation." (*Id.* at p. 1256.)

Applying these principles here, we find no due process violation. As the trial court found, defendant has not shown substantial prejudice. In his pleading in the trial court, he claimed prejudice, largely because some persons who assertedly could have supplied exonerating evidence had died. It is inevitable that over the years potential witnesses will die or otherwise become unavailable. But the claimed prejudice is speculative. No reason exists to believe any of these witnesses would have supplied exonerating, rather than incriminating, evidence, or any evidence at all. Defendant was able to, and did, present evidence in his defense, including evidence suggesting Flores might have committed the crime.

But even if we assume defendant suffered some prejudice, the delay was fully justified. "The delay was investigative delay, nothing else." (*Nelson*, *supra*, 43 Cal.4th at p. 1256.) The prosecution established that the investigators possessed no evidence connecting defendant with the crime until the cold hit in 2002. Indeed, unlike *Nelson*, where the defendant had at least been a suspect from the beginning, defendant was wholly unknown to the investigators until 2002. In the trial court, defendant claimed the investigation was negligent, and a more capable investigation should have uncovered evidence that would have warranted charging him with this murder long before the actual charges. But he failed to establish either that the investigation was negligent or that a different investigation would have led to defendant before 2002. Although the investigators suspected that Linda or Fisher had known the perpetrator, and that Linda was withholding information, neither Linda nor Fisher ever mentioned defendant's name to them, and the investigators had no other reason to know of or suspect defendant of the

16

crime. There is evidence that defendant frequented the bar where Linda had gone the night of the murder, but no doubt so did many others. Even if somehow the investigators had learned that defendant was among those who frequented that bar, such knowledge would have been far from sufficient to charge defendant with the crime.

Sometimes a crime simply is not solved immediately but must await some break in the case, a break that occurred here in 2002, when a cold hit revealed a match between defendant and the evidence samples. "[B]alancing the prejudice defendant has demonstrated against the strong justification for the delay, we find no due process violation." (*Nelson*, *supra*, 43 Cal.4th at p. 1257.)

### 2. *Denial of Discovery Request*

In the trial court, defendant moved to discover all records of Forensic Science Associates (Forensic Science), the private company that did some of the evidence testing in this case, "documenting instances of contamination, also known as records of false positives or unintended transfers of DNA." After presiding over several hearings, the court denied the request. Defendant contends the court erred.

### a. *Factual Background*

At the initial hearing on the request, the prosecutor represented that Forensic Science did not keep separate records of incidents of unintended transfers of DNA. The company documented specific incidents in those cases where they occurred, but it maintained no overall statistics. Moreover, some of the company's records involved requests from criminal defense attorneys and so were confidential. During the hearing, the trial court made clear the defense could "attack" Forensic Science, and that all that was involved in the hearing was what discovery the defense might receive. It also agreed Forensic Science was part of

17

the prosecution team for discovery purposes. But it questioned whether the documentation defendant sought was exculpatory, rather than a "pure fishing expedition," and whether it was "reasonably accessible."

The hearing was continued to allow Dr. Blake to testify. He testified that his normal practice was to document and publish (i.e., disclose publicly) incidents of unintended DNA transfers in the specific cases in which they occurred. He described a case in which Keel's DNA accidentally got onto an evidence sample. But he said the company kept no separate records of those cases, and they are "fairly rare." He estimated the company had had about a "dozen" cases of "misadventuring," all of which, to his knowledge, the company discovered and documented itself. In his view, such records are "only relevant to the investigation at hand." The only way to access the information defendant requested would be to read all of the over 1,000 case files the company had, which would take at least a week.

Moreover, because some of the reports were prepared for criminal defense attorneys, confidentiality concerns existed, and Dr. Blake said he would need anyone who examined them to sign an agreement that the information would not be disclosed. He added that he "would be a bit concerned that a prosecutor would look at some of the reports because, quite obviously, as the court might imagine, that in doing work for the defense, in doing retesting, sometimes that work provides much more damaging information against a defendant than the prosecution knows about."

Dr. Blake also testified that, "by design," his company tested the evidence in two stages. First, the company performed "blind testing" of evidence specimens from the victim. "[W]e were provided evidence specimens, parts of a vaginal swab, and our investigative job was to genetically characterize the spermatozoa from the vaginal swab without having any prior knowledge or access

18

to reference samples from any suspect individual." Second, about a year later, the company received and analyzed blood samples from defendant. When they were testing defendant's blood, they were not working on any of the other evidence samples. (At trial, Keel testified more specifically that the company received the victim's evidence samples in November 2002, and that it produced its formal report after completing the testing on that evidence in January 2003. It tested defendant's blood sample in April 2004.) Dr. Blake explained that "the purpose of doing the test in a blind fashion was to remove any courtroom discussion, at least in theory — this is what the concept was — any courtroom discussion about the potential for comingling the evidentiary material with any reference material for Mr. Cordova."

After Dr. Blake testified, defense counsel stated his willingness to limit the request to instances within 60 days before and after any of the testing. The court questioned whether instances of unintended DNA transfer in other cases would be relevant to this case. It reiterated that defendant could cross-examine the witnesses regarding any matters that might tend to discredit the company's results, including the fact the company does not keep these records. All that was involved in the hearing was whether the court would order Forensic Science to produce the information defendant sought. The court "found that no showing has been made at this juncture, that any of such records of these other cases contain any exculpatory, or potentially exculpatory information, and without such a showing, I'm not prepared to order the production of any of these records at this point." The court added the denial was without prejudice to defendant's production of additional evidence showing how the information could be exculpatory.

Defendant attempted to strengthen his showing, and the court held another hearing. An expert testified for defendant about types of contamination that can occur in the testing of evidence. He explained that "[b]y looking at this on a

19

historical basis, you may, in the case at hand . . . have a setup such that it can be a contamination from a reference sample of a defendant into an evidence sample. That could result in a false inclusion on this case."

Ultimately, the court denied the discovery request. It found that, although Forensic Science was part of the prosecution team regarding the testing done in this case, it was not part of the prosecution team regarding its testing in other cases. Referring to testing done at the request of other parties, the court ruled that "the district attorney has no legal right and no ability to review those files or compel the laboratory in question, Forensic Science Associates, to produce them." Also, it found that "the cost and labor involved in reviewing those files would be considerable." For these reasons, the court did "not believe that [Forensic Science] is to be considered as part of a prosecutorial team with respect to the files in question, and further, that these files are not in possession or readily accessible to the [district attorney]." It denied the discovery motion, but "without prejudice to the defendant seeking to subpoena said files or records directly from [Forensic Science]." The record does not indicate that defendant did attempt to subpoena the records from Forensic Science.

At a later pretrial hearing regarding Forensic Science's testing of the evidence, Keel testified that "whether or not sample A in a case is somehow contaminated has no bearing on whether sample A in a separate case is contaminated, particularly when all of our data is published in this case, you can look at it and see whether or not you think there's any contamination event and investigate it yourself. I mean, certainly there's plenty of this evidence remaining. It can be reexamined, and they can come to their own conclusions as to whether or not our work is reliable or not or contaminated or not. So this time window business [referring to defendant's time window of 60 days before and after the testing] is really kind of just a fishing expedition in my mind." The court

20

interjected that it had "concluded the same thing when I ruled on the discovery issue."

### b. Analysis

Defendant does not deny that he received full discovery regarding the work Forensic Science performed in this case. But he contends the prosecution was obligated to provide discovery of *other* cases the company worked on in which mistakes were made. He claims the discovery was compelled under *Brady v. Maryland* (1963) 373 U.S. 83 and its progeny, as well as the discovery provisions of California's Penal Code.

"The federal due process clause prohibits the prosecution from suppressing evidence materially favorable to the accused. The duty of disclosure exists regardless of good or bad faith, and regardless of whether the defense has requested the materials. [Citations.] The obligation is not limited to evidence the prosecutor's office itself actually knows of or possesses, but includes 'evidence known to the others acting on the government's behalf in the case, including the police.' [Citation.] [¶] For *Brady* purposes, evidence is favorable if it helps the defense or hurts the prosecution, as by impeaching a prosecution witness. [Citations.] Evidence is material if there is a reasonable probability its disclosure would have altered the trial result. [Citation.] Materiality includes consideration of the effect of the nondisclosure on defense investigations and trial strategies. [Citations.] Because a constitutional violation occurs only if the suppressed evidence was material by these standards, a finding that *Brady* was not satisfied is reversible without need for further harmless-error review. [Citation.]" (*People v. Zambrano* (2007) 41 Cal.4th 1082, 1132-1133.)

Additionally, California's reciprocal discovery statute requires the prosecution to provide discovery of "[a]ny exculpatory evidence." (§ 1054.1, subd

21

(e); see *People v. Zambrano*, *supra*, 41 Cal.4th at p. 1133.) This provision requires the prosecution to provide all exculpatory evidence, not just evidence that is material under *Brady* and its progeny. (*Barnett v. Superior Court* (2010) 50 Cal.4th 890, 901.)

We need not and do not decide (1) whether, in some other case, a defendant would be entitled to information of the kind sought here; (2) whether Forensic Science was part of the government team for all purposes; or (3) whether the court was correct in requiring defendant to subpoena the company directly. This is so because two circumstances in this case establish that the information sought could not have been significantly exculpatory and was certainly not material in the *Brady* sense.

First, Dr. Blake testified at the hearing without contradiction, and Keel reiterated at trial, that Forensic Science received and tested the evidence samples from the victim's body, and produced its report regarding that testing, more than a year *before* it first obtained defendant's blood sample for testing. The purpose for doing so was to eliminate any possibility of contamination of the kind defendant claims might have occurred. Whatever might have happened in other cases, in this case, DNA from defendant's blood could not have transferred onto, or otherwise contaminated, the semen and sperm samples from the victim that the company had already tested.

Second, as Keel testified in a pretrial hearing, defendant had available a far more probative means to challenge Forensic Science's results if, in fact, those results were unreliable. He could simply have retested the evidence himself. Other evidence samples were available. The evidence samples were tested multiple times, with the same results each time. Indeed, not only did defendant have the opportunity to test the evidence, he actually did so. His expert, Keith Inman, testified that his testing confirmed what the other tests showed — that the

22

sperm from the victim's body was consistent with defendant's DNA. Inman was not more specific than this, but if his analysis had achieved significantly different results than the other analyses, defendant could have presented that evidence. Moreover, the DNA testing was strongly corroborated by the fact that, although defendant was living in Colorado at the time of the cold hit, he had lived in the area of the murder, and had had a sexual relationship with the victim's mother, at precisely the time of the murder. It would have been a remarkable coincidence if a cold hit had falsely implicated defendant.

Given all of this evidence, it was virtually certain the jury would find the semen and sperm from the victim's body did in fact come from defendant. Indeed, defendant did not dispute this fact at trial. It is not reasonably probable that discovery of what may have occurred in *other* cases would have caused the jury to doubt in this case that defendant was the source of the sperm in the victim's body, or would otherwise have affected the verdict.

Defendant also argues that Forensic Science's failure to keep the records he sought "should be considered exculpatory evidence." But the court made clear it was merely ruling on the discovery request. It did not limit defendant's ability to cross-examine Forensic Science witnesses in this or any other regard or present any of his own impeaching evidence. Whatever value, if any, the evidence that Forensic Science did not keep these records (except in the specific cases) may have had for the defense does not make the information defendant sought any more exculpatory.

The court properly denied the discovery request.

### 3. Admissibility of DNA Evidence

Forensic Science used a DNA testing kit called the Identifiler when it tested the evidence in this case. Before trial, defendant contended the Identifiler was a new scientific technique and, accordingly, evidence based on its use was inadmissible unless the prosecution first established that the technique is generally accepted as reliable in the relevant scientific community. (See *People v. Kelly* (1976) 17 Cal.3d 24 (*Kelly*).) After an evidentiary hearing, the court admitted the evidence. Defendant contends the court erred.

### a. Factual Background

Three witnesses testified at the evidentiary hearing.

Criminalist David Stockwell testified for the prosecution. The Contra Costa crime laboratory had not used the Identifiler kit to examine the evidence in this case, but he was familiar with it. (At trial, he testified his laboratory used two kits, Profiler Plus and Cofiler.) He explained how DNA testing kits work in general. Such kits, including the Identifiler and earlier kits such as Profiler Plus and Cofiler, all use the same basic methodology, specifically, polymerase chain reaction (PCR), which was developed in the 1980's. The methodology examines places on the DNA strand called short tandem repeats (STR's). (See *People v. Jackson* (2008) 163 Cal.App.4th 313, 322 (*Jackson*).) In Stockwell's opinion, there was no significant difference in methodology between the Identifiler and the earlier Profiler Plus and Cofiler. But the Identifiler is more efficient and examines 15 places, called loci, on the DNA strand, whereas earlier kits examined fewer loci.

Various kits developed over time have combined multiple markers into a single kit for greater efficiency. In Stockwell's view, this has been a "developmental process" rather than a "new methodology." All of these kits "utilize the polymerase chain reaction in exactly the same way to produce the

results." Manufacturers are continually trying to improve their testing kits. "[T]hey are doing so at the behest of the forensic community, because we have told them . . . what is important. It would be important to us to get as much information from this original starting amount of material as possible. That allows us to do many things. It allows us to test multiple samples, whereas before we only would be able to test one or a very few. It allows us to maintain some of the evidence for later testing, either for our own purposes or for other scientists' purposes." In the process of this evolution, the various kits have employed somewhat different procedures. For example, the Identifiler uses five colors rather than four, as in previous kits, and it has changed the dyes slightly. But the kits all use the same basic methodology.

Stockwell also testified that, in his opinion, the Identifiler was generally accepted as reliable in the scientific community.

Marc Taylor, who owns a company that performs DNA testing, testified for defendant. At the time he testified, his company had decided not to use the Identifiler. Instead, his company employed the Profiler Plus and Cofiler kits. He testified about the differences between the Identifiler and the earlier kits. Profiler Plus used nine loci and Cofiler four. The Identifiler combined the nine and the four and added two more, so it used a total of 15 loci. He also testified about other differences. In his opinion, these differences meant that the Identifiler used a "novel methodology" that required "developmental validation." He had "questions" about its use. Although "more laboratories are using" the Identifiler, in his opinion, it had not received general acceptance in the scientific community.

Dr. William Shields, a professor at the State University of New York College of Environmental Science and Forestry, testified for defendant that, in his opinion, the Identifiler is a "new method" and a "new technique," although the "methodology is the same for all of these" kits. All of the kits he discussed,

25

including the Identifiler, use PCR and STR's. "So the methods have changed, but the methodology remains the same." He believed that any substantial change in methods requires validation.

After the hearing, the trial court found that the Identifiler is not a new methodology requiring a *Kelly* hearing and, even if it were, it is generally accepted as reliable in the scientific community.

### b. Analysis

Evidence obtained by use of a new scientific technique is admissible only if the proponent of the evidence establishes at a hearing (sometimes called a first prong *Kelly* hearing) that the relevant scientific community generally accepts the technique as reliable. However, proof of such acceptance is not necessary if a published appellate opinion affirms a trial court ruling admitting evidence obtained through use of that technique, at least until new evidence is admitted showing the scientific community has changed its attitude. (*Nelson*, *supra*, 43 Cal.4th at p. 1257; *Kelly*, *supra*, 17 Cal.3d at pp. 30-32.) We must decide whether using the Identifiler kit, rather than an earlier kit, to conduct DNA analysis is a new scientific technique requiring the court to hold a first prong *Kelly* hearing. As we explain, the Identifiler is merely another in a series of improved ways to apply long-accepted science, not a new scientific technique in the *Kelly* sense.

"Forensic DNA analysis is a comparison of a person's genetic structure with crime scene samples to determine whether the person's structure matches that of the crime scene sample such that the person could have donated the sample." (*Nelson*, *supra*, 43 Cal.4th at pp. 1257-1258.) We have repeatedly described the basic methodology behind modern DNA testing. (See, e.g., *People v. Venegas* (1998) 18 Cal.4th 47, 57-63.) The exact methods have evolved over the years.

Formerly, examiners used what is called restriction fragment length polymorphism (RFLP), but that method has become obsolete. (*Nelson*, *supra*, 43 Cal.4th at p. 1258.) The testing here utilized "what is called 'polymerase chain reaction' testing using 'short tandem repeats' (PCR-STR). PCR-STR testing has many advantages over RFLP testing. It can test a far smaller sample than RFLP testing requires. It is less susceptible to sample degradation. It is simpler and less time consuming. Additionally, . . . '[w]ith the ability to compare numerous loci, the discrimination power of PCR-STR testing is extremely high.' " (*Ibid.*) As the high court has summarized, since "the mid-1980's, there have been several major advances in DNA technology, culminating in STR technology." (*District Attorney's Office for Third Judicial Dist. v. Osborne* (2009) 557 U.S. 52, 62.)

A Court of Appeal opinion summarized the method using STR's: "Humans have 23 pairs of chromosomes, which are the packages that actually contain the DNA strands. DNA testing looks at different places called short tandem repeats (STR) that are on specific identified areas of different chromosomes. STR's are sets of four nucleotide units of base pairs on the DNA strand. People have different numbers of repeats. In this case 15 STR areas were examined." (*Jackson*, *supra*, 163 Cal.App.4th at p. 322.)

The basic science behind DNA testing has long been accepted in court. "It has now been over 20 years [now about 24 years] since DNA evidence was first approved by a California appellate court to prove identity in a criminal case." (*People v. Stevey* (2012) 209 Cal.App.4th 1400, 1411, citing *People v. Axell* (1991) 235 Cal.App.3d 836.) But DNA testing is continually being improved. " '[T]he scientific methodology, while fundamentally the same, has become more refined and sophisticated.' [Quoting *People v. Hill* (2001) 89 Cal.App.4th 48, 51.] . . . Neither the use of PCR (polymerase chain reaction) nor STR technology

to analyze mixed-source forensic samples is a new scientific technique. (*People v. Smith* (2003) 107 Cal.App.4th 646, 665 (*Smith*).)” (*Stevey*, at p. 1411.)

“[O]nce a new scientific technique becomes generally accepted, a *Kelly* prong-one hearing is not necessary to establish whether each specific methodology employing the technique is also generally accepted. [Citation.] Rather than quibble over the components of the process or the interpretation of the results, challenges are directed to the weight of the evidence to be determined by the jury and not to its admissibility.” (*People v. Stevey*, *supra*, 209 Cal.App.4th at p. 1418, citing *People v. Cooper* (1991) 53 Cal.3d 771, 812-813.)

As of the time of trial, a published appellate decision had held that the Profiler Plus DNA test kit, described as the “ ‘state of the art’ ” in DNA testing as of 1999, was not a new scientific technique requiring a first prong *Kelly* hearing. (*People v. Hill*, *supra*, 89 Cal.App.4th at p. 51 (*Hill*).) The *Hill* court “reject[ed] the argument that each new PCR/STR test kit must, as a matter of law, be subjected to a *Kelly* prong one analysis to determine scientific reliability.” (*Id.* at p. 58.) After analyzing the differences between the Profiler Plus and earlier kits that had been judicially approved, the court concluded that the “Profiler Plus test kit does not embrace new scientific techniques. To the contrary, it uses the PCR and STR testing methods, which are generally accepted by the scientific community. It is just more sophisticated because it examines a greater number of genetic markers.” (*Id.* at p. 60.)

The same is true of the Identifiler, which is more sophisticated still. Indeed, a decision published after the trial of this case so concluded. (*Jackson*, *supra*, 163 Cal.App.4th 313.) The *Jackson* court explained that the Identifiler “kit examines 15 STR locations as opposed to the 13 different STR locations examined under the combination of the prior ‘Cofiler’ and ‘Profiler Plus’ kits.” (*Id.* at p. 323.) It identified seven differences between the Identifiler and previous kits,

which include all of the differences the witnesses identified at the evidentiary hearing in this case: "(1) the Identifiler test expands the number of loci examined from 13 to 15; (2) the Identifiler test includes a new ingredient called a 'non-nucleotide linker' in the test kit; (3) the Identifiler uses a five-dye system to label DNA fragments instead of the four-dye system used previously; (4) the five-dye system increases the spectral range by 50 nanometers; (5) the software has been altered to read a five-dye system and detect the two new loci; (6) the Identifiler uses half the reaction volume previously required; and (7) the Identifiler reduces the amount of template DNA required under the previous tests." (*Id*. at p. 324, fn. omitted.)

The *Jackson* court explained that, like the Profiler Plus kit at issue in *Hill*, *supra*, 89 Cal.App.4th 48, "the Identifiler test kit uses the PCR/STR testing methods, which have been generally accepted by the scientific community. Although defendant has identified seven changes in the Identifiler kit from the previous test kits, defendant has not shown that these differences change the *methodology* of the testing of the DNA. The changes, although more numerous than those identified by *Hill* for the Profiler Plus test kit, appear to increase the accuracy and efficiency of the same methodology of PCR/STR testing. The Identifiler test kit appears to be a more sensitive test, able to use less template DNA and reaction volume to genetically type more loci using a broader range of fluorescent color dyes. Although defendant, and apparently the trial court, seemed most concerned about the introduction of 'non-nucleotide linkers' in the test kit, defendant admits to not knowing what the substance is and merely speculates the nonnucleotide linkers might interfere with the evaluation of mixed samples. Defendant has not shown the use of nonnucleotide linkers makes the Identifiler test a materially distinct scientific technique. Rather, it appears the Identifiler is a new and improved version of the same scientific procedure already generally

29

accepted by the scientific community." (*Jackson*, *supra*, 163 Cal.App.4th at p. 325.)

For these reasons, the *Jackson* court concluded that the trial court properly found that no first prong *Kelly* test was necessary before admitting evidence produced by use of the Identifiler. (*Jackson*, *supra*, 163 Cal.App.4th at p. 325.)

In light of *Jackson*'s analysis of the Identifiler and its methodology, we uphold the trial court's conclusion that the Identifiler did not constitute a new scientific technique. Although the trial court here did not have the benefit of a published appellate opinion, *Jackson*'s findings and reasoning leave little doubt that the trial court correctly determined that the Identifiler did not require a first prong *Kelly* hearing. Even aside from *Jackson*, based on the expert testimony, the trial court reasonably concluded that the Identifiler is a modified application of accepted scientific principles and practices. The testimony indicated that there is an understanding of the impact that such differences can have on the reliability of the test and that multiple agencies have conducted validation testing on the new product. In this context, no further evidence was required to establish admissibility.

This conclusion does not mean a defendant cannot challenge a technological innovation like the one here. If defendant truly believed there were problems with the Identifiler affecting its reliability, he could have cross-examined the witnesses presenting the evidence or presented his own impeaching evidence. Challenges to evidence of this kind go to its weight, for the jury to determine, and not to its admissibility. (*People v. Stevey*, *supra*, 209 Cal.App.4th at p. 1418.) In fact, because all of the testing, including that done by defendant's own expert, reached consistent results, no reason exists to doubt the reliability of the Identifiler or any of the other kits used in this case.

30

Because of this conclusion, we need not decide whether the trial court correctly also found that the Identifiler had achieved general acceptance in the relevant scientific community.

### 4. *Opinion Testimony That Defendant Was the Source of the Evidence Samples*

Over objection, during the guilt phase the court permitted Contra Costa crime laboratory criminalist Stockwell to give the opinion that, to a reasonable scientific certainty, and assuming a population of unrelated individuals, defendant was the source of the sperm found in the victim's body. He based this opinion on his examination of the evidence, which established that the DNA profile of the sperm from the body is so rare that it would occur among unrelated persons in only one person out of a number that is somewhere between a million and a billion times larger than the number of people on earth. Defendant contends the court erred. It did not.

When the defendant's DNA matches the DNA of the evidentiary sample, the next question is the significance of the match. Experts calculate the odds that a random person would have a similar match using a method called the product rule to calculate how rare the sample is in the relevant population. Such odds are typically " 'stated as one in some number.' " (*Nelson*, *supra*, 43 Cal.4th at pp. 1258-1259.) Here, the odds were astronomical. Given those odds, Stockwell's opinion that defendant was the source of the evidentiary samples to a reasonable scientific certainty was reasonable.

There is "no categorical prohibition . . . on source attribution — expression by an otherwise qualified expert of an opinion that the quantitative and qualitative correspondence between an evidentiary sample and a known sample from a defendant establishes identity to a reasonable scientific certainty." (*People v. Cua* (2011) 191 Cal.App.4th 582, 600, fn. omitted.) Indeed, this and other courts have

31

already suggested that when the odds are as astronomical as those here, and except for identical twins or close relatives, it might be appropriate for the expert to testify that, to a reasonable scientific certainty, the evidence sample and the defendant's sample came from the same person. (*Nelson*, *supra*, 43 Cal.4th at p. 1262, fn. 1, and cases cited.) Even the high court has recognized that "[i]t is now often possible to determine whether a biological tissue matches a suspect with near certainty." (*District Attorney's Office for Third Judicial Dist. v. Osborne*, *supra*, 557 U.S. at p. 62.)

Permitting an expert to give this opinion, if indeed it is his or her opinion, does not leave defendants without recourse if they wish to challenge it. They can cross-examine the expert regarding the basis of the opinion or present their own evidence, or both. Here, defendant could have cross-examined Stockwell about the odds regarding *related* persons and the possibility that the sperm came from a relative, or about the possibility that this was the one case in a million (or billion) in which someone else on the planet who was unrelated to him had the same DNA profile as defendant. Of course, he would also have had to argue to the jury that it was coincidence that this hypothetical other person happened to have been in Contra Costa County the night of August 24-25, 1979, and murdered the daughter of a woman with whom defendant had a sexual relationship. And he would have had to confront the fact that Dr. Blake, who used the more sophisticated Identifiler, which used 15 loci instead of 13 and thus identified two more matches, provided odds that were even more astronomical. Instead, defendant, quite reasonably, conceded that he was the source of the evidence samples and tried to present an innocent explanation for this circumstance.

Defendant contends that Stockwell committed what the high court has referred to as the "so-called 'prosecutor's fallacy.' " (*McDaniel v. Brown* (2010) 558 U.S. 120, 127.) The court explained: "The prosecutor's fallacy is the

assumption that the random match probability is the same as the probability that the defendant was not the source of the DNA sample. . . .  [I]f a juror is told the probability a member of the general population would share the same DNA is 1 in 10,000 (random match probability), and he takes that to mean there is only a 1 in 10,000 chance that someone other than the defendant is the source of the DNA found at the crime scene (source probability), then he has succumbed to the prosecutor's fallacy." (*Id.* at p. 128.)

Stockwell's opinion had nothing to do with the prosecutor's fallacy.  He based his opinion on the astronomical odds against any other person on earth having the same DNA profile and merely presented his opinion that, due to these odds, defendant was the source of the evidence samples to a reasonable scientific certainty.  Doing so was not fallacious.

Defendant relies primarily on *Brown v. Farwell* (9th Cir. 2008) 525 F.3d 787, reversed sub nomine *McDaniel v. Brown*, *supra*, 558 U.S. 120, where the Ninth Circuit set aside a conviction because of two errors it identified in the use of DNA statistics, including committing the prosecutor's fallacy.  Even aside from the fact that the high court *reversed* this decision, it is not on point.  (See the discussion in *People v. Cua*, *supra*, 191 Cal.App.4th at pp. 599-600.)

Finally, defendant argues that, in effect, his jury was "told that the scientific community was able to say that [he] was guilty."  As the high court has observed, it would be "error to equate source probability with probability of guilt, unless there is no explanation other than guilt for a person to be the source of crime-scene DNA." (*McDaniel v. Brown*, *supra*, 558 U.S. at p. 128.)  But Stockwell expressed no opinion regarding defendant's guilt.  He merely provided the opinion that defendant was the source of the evidence samples.  It was left to the jury to determine the significance of this testimony.

## 5. *Admissibility of Evidence of Other Sex Offenses*

Over objection, the court admitted evidence of defendant's 1992 and 1997 sex offenses in Colorado under Evidence Code section 1108. It found that the probative value of the evidence outweighed its prejudicial effect. Defendant contends the court erred. We disagree. The court acted within its discretion in admitting the evidence.

When a defendant is accused of a sex offense, Evidence Code section 1108 permits the court to admit evidence of the defendant's commission of other sex offenses, thus allowing the jury to learn of the defendant's possible disposition to commit sex crimes. (*People v. Avila* (2014) 59 Cal.4th 496, 514-515.) The court has discretion under Evidence Code section 352 to exclude the evidence if it is unduly prejudicial. (*Avila*, at p. 515.) The evidence is presumed admissible and is to be excluded only if its prejudicial effect substantially outweighs its probative value in showing the defendant's disposition to commit the charged sex offense or other relevant matters. (*People v. Loy* (2011) 52 Cal.4th 46, 62, citing Historical Note, 29B pt. 3, West's Ann. Evid. Code (1998 pocket supp.) foll. § 1108, p. 31.) The court's ruling admitting the evidence is reviewed for abuse of discretion. (*Avila*, at p. 515.)

Defendant does not deny that Evidence Code section 1108 applies. The Colorado crimes were sex offenses, and he was charged with a sex offense within the meaning of that section. (See *People v. Story* (2009) 45 Cal.4th 1282, 1290-1291.) But defendant contends the court abused its discretion. It did not. "Nothing about the evidence here required the trial court to find the presumption in favor of admissibility had been overcome." (*People v. Loy*, *supra*, 52 Cal.4th at p. 62.) Defendant had been convicted of the other offenses, which supports their admission. Because his commission of those offenses had already been established, he bore no new duty to defend against the charges. Moreover, the

jury would not be tempted to convict defendant of the charged crime to punish him for the other ones.  (*Id.* at p. 61.)  Additionally, the "evidence was presented quickly, with only the victim of each assault testifying."  (*Ibid.*)

Defendant contends the Colorado offenses were too far removed in time (13 and 18 years later) from the charged crime to be admissible.  Although this a relevant factor for the court to consider in exercising its discretion (*People v. Loy*, *supra*, 52 Cal.4th at p. 62), the time gap alone does not compel exclusion of the evidence.  Neither Evidence Code section 352 nor Evidence Code section 1108 contains rigid requirements.  (*People v. Branch* (2001) 91 Cal.App.4th 274, 285 ["significant similarities between the prior and the charged offenses may 'balance[] out the remoteness' "].)  Defendant does not point to any evidence that his character changed over the relevant time period or offer any reason that such a change might have occurred.  Moreover, evidence of subsequent crimes may bear on a defendant's character at the time of the charged offense.  (*People v. Medina* (2003) 114 Cal.App.4th 897, 903; *People v. Shoemaker* (1982) 135 Cal.App.3d 442, 447-448; 5 Wigmore, Evidence (Chadbourn rev. ed. 1974) § 1618, p. 595.) The fact that defendant committed two sex offenses against young children after the crime in this case permits the logical conclusion that defendant had a propensity to commit sex offenses against young children earlier in his life, even if years separated the crimes.

Defendant also contends the later offenses were too dissimilar to the charged crime to be admissible.  Although this is also a relevant factor for the court to consider in exercising its discretion (*People v. Loy*, *supra*, 52 Cal.4th at p. 63), dissimilarity alone does not compel exclusion of the evidence.  " '[T]he charged and uncharged crimes need not be sufficiently similar that evidence of the latter would be admissible under Evidence Code section 1101, otherwise Evidence Code section 1108 would serve no purpose.  It is enough the charged and

35

uncharged offenses are sex offenses as defined in section 1108.' " (*Ibid*., quoting *People v. Frazier* (2001) 89 Cal.App.4th 30, 40-41.) Defendant stresses that the Colorado crimes contained none of the violence of the charged crime. But this circumstance reduces any prejudicial effect. As the trial court noted, because the uncharged crimes were not inflammatory compared to the charged crime, there was little prejudice. (*Loy*, at p. 62.) The crimes bore the following commonality: All were sex offenses committed late at night inside a home against young children of similar age, which permitted the inference that defendant had a propensity to commit such sex offenses, including the charged crime. *(People v. Avila*, *supra*, 59 Cal.4th at p. 516.) "This circumstance brings the evidence precisely within the primary purpose behind Evidence Code section 1108." (*Ibid*.) Moreover, the evidence was relevant to rebut the defense theory that defendant's sperm entered Cannie's body by innocent means.

Defendant relies heavily on *People v. Abilez* (2007) 41 Cal.4th 472 and *People v. Harris* (1998) 60 Cal.App.4th 727. *Abilez* found no abuse of discretion in the trial court's *excluding* evidence. "[A] finding of no abuse of discretion in one court's exclusion of evidence has no bearing on whether a different court abused its discretion in admitting evidence in a different trial." (*People v. Loy*, *supra*, 52 Cal.4th at p. 64.)

*Harris* is entirely different than this case. In *Harris*, the victims of the charged offenses were mental health patients at a treatment center where the defendant was employed as a mental health nurse, and the offenses involved breaches of trust rather than violence. (*People v. Harris*, *supra*, 60 Cal.App.4th at pp. 730-732, 738.) The uncharged offense, by contrast, was a violent sexual assault on a resident of an apartment complex. There was no evidence that victim had been a patient at a hospital where the defendant worked. (*Id*. at p. 733.) The Court of Appeal described the evidence of the uncharged crime as "inflammatory

36

*in the extreme.*" (*Id.* at p. 738.) Thus, the charged offenses were "of a significantly different nature and quality than the violent and perverse attack on a stranger that was described to the jury." (*Ibid.*) Additionally, "[t]he facts of the prior conduct were redacted to a point that the jury must have come away with a misleading impression of what happened . . . ." (*Id.* at p. 733.) *Harris*'s holding does not support a finding the trial court abused its discretion in this case with its very different facts. (See also *People v. Loy*, *supra*, 52 Cal.4th at p. 64.)

Defendant also cites the recent decision in *People v. Jandres* (2014) 226 Cal.App.4th 340, 355-357, which found the trial court abused its discretion in admitting evidence that the defendant had once put his finger in the mouth of an 11-year-old girl to show a propensity to rape an 18-year-old woman. *Jandres* is also distinguishable. Although the Court of Appeal in *Jandres* found unreasonable the inference of propensity in that case, in this case, as discussed, defendant's Colorado sex offenses were relevant and thus admissible.

### 6. *Claim of Denial of Right to Confront Witnesses*

Dr. Word, the expert who testified about Cellmark Diagnostics's 1996 testing of the evidence samples, did not personally perform the testing. She had held a "senior management position" with Cellmark Diagnostics. In that capacity, she reviewed the work of the analyst who did the actual testing, who was unavailable at the time of trial. She also signed the resulting reports. Dr. Word had worked with the analyst closely over a 15-year period and had reviewed much of her work. Dr. Word testified that the testing excluded Flores as a possible source of the semen in the victim's body, and that the samples contained a large amount of sperm, indicating it came from an undiluted fresh ejaculate. She also gave the opinion that the amount of sperm was inconsistent with its having been

37

inside a child who had been active for at least 24 hours. The Cellmark Diagnostics reports themselves were not admitted into evidence.

Relying on a series of United States Supreme Court decisions beginning with *Crawford v. Washington* (2004) 541 U.S. 36, defendant contends that Dr. Word's testimony violated his right under the Sixth Amendment to the United States Constitution to confront and cross-examine the analyst who did the actual testing. However, he did not object on this basis at trial. Because *Crawford* significantly changed the law regarding confrontation rights, we have permitted defendants to raise the issue on appeal even in the absence of an objection in cases tried before *Crawford*. (*People v. Banks* (2014) 59 Cal.4th 1113, 1167.) Here, Dr. Word testified in January 2007, years after *Crawford* was decided. Defendant argues that he should still be excused from the objection requirement because some of *Crawford*'s progeny postdated the trial, including *Melendez-Diaz v. Massachusetts* (2009) 557 U.S. 305, the first high court opinion involving forensic testing. But he could easily have objected at trial under *Crawford*. Indeed, by the time of trial, numerous published appellate opinions had applied *Crawford* to questions about the admission of forensic evidence. (See *People v. Geier* (2007) 41 Cal.4th 555, 598-602 [collecting cases].) Accordingly, the usual rule requiring an objection at trial applies. Defendant has forfeited the claim. (Evid. Code, § 353, subd. (a); *People v. Abel* (2012) 53 Cal.4th 891, 924.)

In fact, defendant had little reason to object to Dr. Word's testimony at trial. It was far less important than, and entirely consistent with, the testimony of the other experts, including Stockwell, Keel, Dr. Blake, and even defendant's expert, Inman, all of whom, unlike Dr. Word, compared the evidence samples to defendant's own DNA. By the time of trial, defendant did not contest that the evidence samples from the victim's body came from him. Dr. Word noted that the samples contained a large amount of sperm, but so did all of the other experts,

38

including Inman. Her opinion regarding the significance of this fact was also consistent with the other expert opinions including, to a large extent, defendant's expert. Inman testified that if the semen had transferred into Cannie Bullock from a source other than defendant, it must have come from a "neat semen sample," meaning "basically undiluted ejaculate," and there must not have been a "mechanism that would serve to somehow remove the semen."

Any error would have been harmless beyond a reasonable doubt. (*People v. Banks*, *supra*, 59 Cal.4th at p. 1168.) As noted, Dr. Word's testimony was consistent with that of the other criminalists. Although no other expert specifically testified that Flores's DNA did not match the DNA of the evidence samples, the other experts' mutually consistent testimony, generally giving astronomical odds that the samples came from defendant, implicitly meant the samples did not come from Flores. As defendant notes, Stockwell initially relied on the DNA profile of the evidence samples that Cellmark Diagnostics developed. But later, on separate occasions, he also tested two evidence samples himself and reached the same results as Cellmark Diagnostics's earlier testing. The other criminalists also did their own testing. Any error in admitting Dr. Word's testimony could not have prejudiced defendant.

### 7. *The Prosecutor's Jury Argument*

Defendant contends the prosecutor committed misconduct during the guilt phase closing argument. We disagree.

Defendant presented some evidence tending to connect Flores to the sewing machine manual found in the Bullock house after the crime. He also sought to admit a document marked as defense exhibit O, which defense counsel described as appearing to be a photocopy of an envelope with the name, William Flores, in the left-hand corner, and appearing to be addressed to a correspondence school for

sewing machine repair. Defense counsel showed it to Flores's sister, but she could not say what it was or whether it contained Flores's handwriting. He also showed it to an investigator in the case, who said he had found the paper in the case file but did not otherwise identify it. When defendant sought to admit the exhibit, the court sustained the prosecutor's objection on the basis of a lack of foundation, and it was not admitted into evidence.

In her rebuttal argument to the jury, the prosecutor discussed in some detail the evidence defendant presented trying to show that Flores was the killer, including the evidence connecting Flores to the manual. She summed up her view of this evidence by saying, "The sewing machine manual has nothing to do with the case. There isn't even evidence that it has anything to do with Mr. Flores, let alone with the murder."

Defendant contends the prosecutor committed misconduct in making this argument because, he argues, it "was patently untrue, as Exhibit O, which the prosecutor successfully suppressed, directly connected Mr. Flores with the sewing machine manual." However, he did not object to the argument at trial. An admonition could easily have cured any harm, and no reason appears to find that an objection would have been futile (except that, as we explain, it lacked merit). Accordingly, defendant has forfeited the claim on appeal. (*People v. Jackson* (2014) 58 Cal.4th 724, 765.)

The contention also lacks merit. The prosecutor's argument was a fair comment on the evidence actually before the jury. The court refused to admit the exhibit into evidence due to a lack of foundation — no one could say what it was — a ruling defendant does not challenge on appeal. Thus, it was not evidence in the case, and the prosecutor was not permitted to discuss it before the jury. "Because the prosecutor's argument constituted fair comment on the evidence, following evidentiary rulings we have upheld, there was no misconduct and,

contrary to defendant's claim, no miscarriage of justice." (*People v. Lawley* (2002) 27 Cal.4th 102, 156.) Defendant argues that *Lawley* was wrongly decided, but *Lawley* decided nothing new. Defendant presents no reason to conclude that prosecutors commit misconduct in limiting their jury argument to the evidence the jury actually heard.

Given the strength of the evidence against defendant, the argument was also harmless. The evidence that defendant was the source of the semen and sperm in the victim's body was so strong that he did not contest it at trial. Rather, he attempted to present an innocent explanation for that circumstance — essentially, that semen from sexual intercourse he had engaged in with the victim's mother somehow transferred to the victim before someone else murdered her. But, given the overall evidence, this theory was implausible. Dr. Word, Stockwell, Dr. Blake, and Keel all testified that the sperm in the evidence samples was inconsistent with a transfer theory. Even according to defendant's own expert, the only way for the large amount of semen to have gotten into the victim's body from someone other than the killer would have been for an undiluted semen sample to be introduced into the child before it had time to dry, and for nothing, such as a child's normal activity, to happen that would remove the semen. Defendant's specific theory apparently was that he had intercourse with the victim's mother, but ejaculated directly onto the bed sheet, and that Cannie then promptly sat on the undiluted ejaculate (presumably without noticing) before it had time to dry, thus causing her to receive the large amount of semen later found in her body.

Such a scenario is inherently unlikely. But it was also contrary to much other evidence. Linda testified that she had not had intercourse with anyone the night Cannie died or the night before, and she had previously told the police the same thing. Even aside from this testimony, a jury could find it unlikely she would have intercourse first, *then* go to a bar. Linda also testified that Cannie

41

never got into her bed after she had had sex.  Her bed was neat and undisturbed after the killing.  There was also evidence Cannie had had a bath before she was killed, which would likely have removed most of the semen from her body even under defendant's transfer theory.

But these are not the only, or even the most, implausible circumstances a jury would have to assume to hypothesize defendant's innocence.  The brutal, sexual murder of a child is, fortunately, a rare event.  But to have a reasonable doubt that defendant was the killer, the jury would additionally have had to find reasonable the possibility that the real killer — defendant's candidate was Flores — chose the precise time that defendant's semen had been introduced into Cannie's body to enter the Bullock home and commit this murder, and that he did so without leaving any discernable amount of his own DNA in or on Cannie's body.

Given this evidence, we conclude, under any standard, that the jury verdict would not have been more favorable to defendant had the prosecutor not made this jury argument.

## B.  Issues Relating to Penalty

### 1.  Consideration of Defendant's Prior Offenses

Defendant contends the trial court erred in permitting the penalty jury to consider the two sex offenses he committed against children in Colorado years after the murder in this case.

### a.  Factual Background

After the guilt verdict, defendant objected to the penalty jury's considering the evidence of the Colorado sex offenses that had been admitted in the guilt phase.  He argued that the evidence did not constitute proper aggravating evidence under section 190.3.  The court agreed the crimes were not admissible under

section 190.3, factor (b), because they did not involve force or violence or the threat of force or violence. However, it found the evidence was relevant as a circumstance of the crime under section 190.3, factor (a), and also potentially as rebuttal evidence if defendant placed his character in issue.

The court explained: "The acts of molestation committed by Mr. Cordova in Colorado logically . . . tend[] to show the nature of the crime that he committed in 1979 here in San Pablo; that is, that not only was it a murder, but it was indeed, as is alleged by the People in their special circumstances allegations and found to be true by the jury, that . . . this murder was committed while he was engaged in an act of rape and in an act of lewd and lascivious conduct. For those reasons, it will be admitted." Later the court explained further that defendant's "proclivity to commit sexual crimes [was] evinced by his post-crime molestations."

During the penalty phase, defendant presented several witnesses who testified about his character. The direct or cross-examination of these witnesses mentioned the Colorado crimes several times without objection, and the jury was already aware that defendant had been convicted of them. When he testified, defendant denied committing those crimes.

In instructing the jury, the court defined the statutory factors listed in section 190.3, including factor (b), then specified what alleged crimes the jury could consider under that factor. It told the jury it could not consider any other evidence under factor (b). Specifically, the court instructed the jury that the Colorado sex offenses "did not disclose the commission of crimes covered by factor (b) and may not be considered as an aggravating factor pursuant to the paragraph. Such evidence, however, may be considered by you, if you so find, as aggravating pursuant to factor (a) and also to negate any mitigating evidence if and to the extent that you find that it does so."

43

In her argument to the jury, the prosecutor told the jury that the only convictions it could consider under section 190.3, factor (c), were convictions defendant suffered before the crime in this case. She said, "You can't consider felony convictions that occurred afterwards." She discussed defendant's 1970 forgery conviction and his 1977 conviction for possessing a sawed-off shotgun in this regard but not the two Colorado convictions. She referred to the Colorado crimes only briefly in discussing defendant's character evidence in mitigation. She did not argue that the evidence of the crimes was itself aggravating.

### b. Analysis

Section 190.3 lists factors for the jury to consider in deciding penalty, including factor (a) ("The circumstances of the crime of which the defendant was convicted in the present proceeding and the existence of any special circumstance found to be true . . . ."), factor (b) ("The presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence or the express or implied threat to use force or violence."), and factor (c) ("The presence or absence of any prior felony conviction."). The penalty jury may consider in aggravation only matters coming within one of section 190.3's factors. (*People v. Boyd* (1985) 38 Cal.3d 762, 774.)

As the trial court recognized, the Colorado sex offenses did not involve force or violence or the threat to use force or violence. Accordingly, they did not come within section 190.3, factor (b). Additionally, this court has held that felony convictions suffered *after* commission of the capital crimes do not come within section 190.3, factor (c). (*People v. Balderas* (1985) 41 Cal.3d 144, 201-203.) Accordingly, the Colorado convictions, suffered after the capital crime in this case, also do not come within factor (c). Thus, we must decide whether the court properly permitted the jury to consider the crimes under section 190.3, factor (a)

44

(circumstances of the crime and special circumstances) and to rebut defendant's character evidence.

The Attorney General argues that defendant has forfeited part of his argument. We agree that, to the extent, if any, he argues the trial court erred in permitting use of the sex offenses to rebut defendant's character evidence, he has forfeited that claim. He did not object on the ground that the evidence was improper rebuttal either before or when the evidence was presented. (Evid. Code, § 353, subd. (a); *People v. Riel* (2000) 22 Cal.4th 1153, 1207.) But the main thrust of his argument — that the court should not have permitted the jury to consider the sex offenses under section 190.3, factor (a) — is preserved. Defendant did object on this basis, and he may argue that the court erred on this ground. Because defendant presented his character evidence only after, and in light of, the ruling that the evidence was admissible under factor (a), he may also argue that error on this ground was prejudicial notwithstanding the fact the evidence was later used as rebuttal. He is merely precluded from arguing that admitting the evidence as rebuttal was an *additional* error.

Turning to the merits, we see no error. The court properly admitted the evidence on both grounds that it stated.

The Colorado crimes were admitted in the guilt phase because they showed defendant's propensity to commit sex offenses against young children which, in turn, helped the jury understand the circumstances of the capital crime. (See p. 34, *ante*.) "So long as it considered the evidence offered at the guilt phase of trial solely for this purpose, the jury was entitled to take into account all of the evidence offered at the guilt phase as part of the 'circumstances of the crime,' an aggravating factor that the jury may consider in its penalty deliberations. (§ 190.3, factor (a).)" (*People v. Champion* (1995) 9 Cal.4th 879, 947.) "Factor (a) of section 190.3 allows the prosecutor and defense counsel to present to the penalty

45

phase jury evidence of all relevant aggravating and mitigating matters 'including, but not limited to, *the nature and circumstances of the present offense*, . . . and the defendant's *character*, background, history, *mental condition* and physical condition.' " (*People v. Guerra* (2006) 37 Cal.4th 1067, 1154, some italics added.) The evidence may be relevant "under section 190.3, factor (a), to the extent that [it] gives rise to reasonable inferences concerning the circumstances of the crime and defendant's culpability." (*People v. Riggs* (2008) 44 Cal.4th 248, 321-322.) The court properly permitted the jury to consider the evidence for this limited purpose.

The court also properly permitted the jury to consider the evidence to rebut defendant's mitigating evidence. Evidence rebutting character evidence is admissible if it relates to a *particular* character trait defendant has offered in his behalf. The evidence is permissible to undermine the defendant's claim that his good character warrants the jury's exercise of mercy and to present a more balanced picture of that character. The broader the range of the defendant's character evidence, the broader may be the range of the rebuttal evidence, as long as the rebuttal evidence relates to some character trait the defendant has placed into evidence. Whether to admit rebuttal evidence comes within the trial court's discretion, reviewable for abuse of that discretion. (*People v. Valdez* (2012) 55 Cal.4th 82, 169-170; *People v. Loker* (2008) 44 Cal.4th 691, 709.)

Defendant presented substantial and wide-ranging evidence of his good character. For example, one of defendant's sisters testified that he "was always a nice, kind person," that her daughters "loved him," that he was "always nice" to them, and that she never had any concern leaving him alone with them. She never saw "him do anything that [she] thought was wrong or weird." In light of this and other testimony, the trial court acted within its discretion in permitting the jury to

46

consider the Colorado sex offenses to present a more balanced picture of defendant's character.

## 2. Evidence of Defendant's Threat to Kill a Prosecutor

Defendant contends the court erroneously admitted evidence that he once threatened to kill a prosecutor.

### a. Factual Background

The prosecution sought to present evidence in aggravation that defendant once threatened to kill a female prosecutor in Colorado. The prosecution's offer of proof was that in 1994, the woman was prosecuting defendant for domestic violence. During a therapy session while he was out of custody, defendant told the therapist that he wanted to kill the prosecutor and would have done so if he had had a gun. The therapist took the threat seriously enough that she informed the prosecutor of it, and, as a result, defendant's bail was revoked. The prosecutor here sought to have the therapist testify. Defendant objected, arguing the threat did not amount to a crime. After a hearing, the court agreed with defendant and ruled the threat was not admissible as evidence of other criminal conduct involving force or violence under section 190.3, factor (b). Accordingly, the prosecution did not present the evidence as part of its case in aggravation, and the therapist never testified.

Defendant called as a witness in mitigation his sister-in-law, Vicki Cordova. She testified on direct examination that she had "never seen [defendant] mistreat any woman or be violent with any woman." On cross-examination, the prosecutor asked the witness about incidents of violence against women, including this question: "And you didn't know anything about, until this trial, that he threatened to kill a female DA that was prosecuting him?" The witness responded, "I never heard that until the trial." Outside the jury's presence, defendant objected

47

on the ground that the question "exceed[ed] the bounds" of the character evidence he had presented. The court overruled the objection. It stated that "the implication certainly of the testimony is that he's a person of good character, especially dealing with women. In light of that, that was certainly fair questioning."

When defendant testified, the prosecutor cross-examined him about incidents of violence against women. He admitted telling the therapist "I was mad enough I could have killed" the prosecutor, and that "if I would have had a gun, I would have killed that bitch." But he said he was just expressing his anger because it was an anger management class, and he was not actually threatening to kill her.

The court instructed the jury that "[t]he evidence you heard regarding a comment made by defendant concerning a district attorney did not disclose a crime covered by factor (b) [of section 190.3] and may not be considered by you as an aggravating factor under that paragraph. It may, however, be considered by you for the purpose and to the extent that it may serve to negate any mitigating evidence."

In her argument to the jury, the prosecutor discussed defendant's witnesses who "come in and talk about how good the defendant treats women." As part of this discussion she referred to the threat. She added that nothing about the threat "can be aggravating, but there's nothing about his relationships with women or his treatment of women that is mitigating."

*b. Analysis*

Defendant contends the court erred "in admitting evidence of nonstatutory aggravation in the form of [his] threat at a prison anger management session to kill a deputy prosecutor."

48

Preliminarily, noting that defendant referred to this incident in some of his own questioning of defense witnesses and, when the parties discussed jury instructions, he agreed the evidence might be proper rebuttal, the Attorney General argues that the claim is forfeited.  We disagree.  The actions the Attorney General cites occurred *after* defendant's objection to Vicki Cordova's cross-examination had been overruled, and the jury had already heard about the incident.  At that point, defendant was merely trying to deal with the ruling as best he could.  In discussing instructions, defense counsel argued, successfully, that the jury should be told it could not consider the incident in aggravation, although he conceded the incident could serve to impeach some of the mitigating evidence, a concession that merely recognized the court's previous ruling.  Defendant's initial objection preserved the contention.

The contention, however, lacks merit.  The court ruled the evidence not admissible in aggravation and so instructed the jury.  It only permitted use of the evidence to rebut defendant's character evidence.  Doing so was within its discretion.  As we have explained, the court has discretion to permit evidence that rebuts defendant's character evidence.  Here, defendant presented specific evidence that he treated women well and was not violent toward them.  Evidence presenting a different picture was admissible to rebut that evidence.  (*People v. Valdez*, *supra*, 55 Cal.4th at pp. 169-170; *People v. Loker*, *supra*, 44 Cal.4th at p. 709.)

Defendant also contends the evidence was privileged under the psychotherapist-patient privilege of Evidence Code section 1014, which generally makes privileged "a confidential communication between patient and psychotherapist."  (See *Menendez v. Superior Court* (1992) 3 Cal.4th 435.)  Defendant may not raise that claim on appeal, however, as  he did not object on that basis at trial.  (*People v. Combs* (2004) 34 Cal.4th 821, 863.)  Moreover, on

49

this record, we cannot say that an objection, if made, would have been meritorious. The record does not show that the therapist was a psychotherapist, or defendant a patient, within the meaning of the privilege, or that the remaining requirements of the privilege were met. Moreover, the privilege does not exist "if the psychotherapist has reasonable cause to believe that the patient is in such mental or emotional condition as to be dangerous to himself or to the person or property of another and that disclosure of the communication is necessary to prevent the threatened danger." (Evid. Code, § 1024.) Here, the offer of proof indicated that the therapist took the threat by defendant, who was out of custody, seriously enough to warn its target, leading to the revocation of defendant's bail. No reason exists to find the threat was privileged.

### 3. Claims of Instructional Error

Defendant contends the court misinstructed the jury in two respects.

### a. Instruction During Jury Selection

Defendant contends that during jury selection, the court "misled the jury into believing that, in some cases, the death penalty was mandated by law" in violation of cases such as *Boyde v. California* (1990) 494 U.S. 370 and *People v. Brown* (1985) 40 Cal.3d 512 (*Brown*).

To obtain sufficient jurors, the court examined three panels of prospective jurors. It described to each of the panels the trial process the jury would encounter. Quoting some of the court's language out of context, defendant claims it told the jury that imposition of the death penalty was mandatory in some situations. Although, as we explain, the court used some language that should be avoided, in context, it made clear that the penalty decision was a weighing process, and the death penalty was never mandated.

50

The court informed the first panel that "what is envisioned is that the jury will weigh the circumstances in aggravation and the circumstances in mitigation. They will compare them and weigh them . . . and ultimately make a decision as to whether . . . or not the circumstances — or how the circumstances in aggravation compare to the circumstances in mitigation. If the jury found that the circumstances in aggravation so substantially outweigh those in mitigation that it warrants the imposition of the death penalty, *they will vote for the death penalty*. If it finds that they do not, then they will vote for life without the possibility of parole. This weighing process, it's not a mechanical counting. . . . So ultimately the weighing process is a qualitative — in fact, it's a moral decision that ultimately you make. A better word is normative decision. You will make a decision as to what you believe — what penalty should be imposed in light of the aggravating and mitigating circumstances, weighed against each other, attributing each of these factors whatever value, moral value, you think they deserve. And that's the nature of the decision you're going to be called upon to make." (Italics added.) At another point, the court specifically told the panel that if the jury found defendant guilty of first degree murder with special circumstances, "you can consider the imposition of the death penalty, but you're not required to vote for the death penalty." It also explained, "You can vote for death or life without the possibility of parole depending on what you feel is warranted after considering the circumstances in aggravation and in mitigation."

The court informed the second panel that "the law does not require one or the other of these penalties [death or life without parole], however. Under California law, the death penalty, for example, is never mandatory." It said "the choice as to whether it will be death or life without the possibility of parole is up to the jury to decide after a consideration of what are called aggravating factors and mitigating factors." It also explained that the jury "must consider the

51

aggravating factors and the mitigating factors, compare them, weigh them and determine if you can — whether the aggravating factors so substantially outweigh the mitigating factors as to warrant the death penalty.  And if you find that the aggravating factors so substantially outweigh . . . the mitigating factors as to warrant imposition of the death penalty, *then you should vote for the death penalty*."  (Italics added.)

The court informed the third panel that "you look at these aggravating factors, and you weigh them against the mitigating factors or vice versa, and then you determine, if you can, what the appropriate penalty should be in this case.  The process is not . . . a mathematical one.  It's not quantitative. . . .  It's a qualitative one.  You accord whatever weight and value to them as you think is important, according to your value system."  It also explained, "If you find, and only if you find, that the aggravating factors so substantially outweigh the mitigating factors that in your mind it warrants the imposition of death, *then you vote for death*.  And only if you find that the mitigating factors outweigh the aggravating factors that the life without the possibility of parole is warranted, then you should vote for that."  (Italics added.)  Later, the court stated that "under California law, the imposition of the death penalty is never mandatory."

Defendant contends the language italicized in the above quotations misled the jury into believing that the death penalty might be mandatory in some situations.  We have explained that an instruction that the jury "shall" impose the death penalty if it finds that the aggravating circumstances outweigh the mitigating circumstances might in some cases mislead the jury regarding its sentencing discretion, and we suggested alternative language.  (*Brown*, *supra*, 40 Cal.3d at pp. 544-545 & fns. 17, 19.)  In isolation, some of the court's language came perilously close to saying the jury "shall" impose the death penalty in some situations.  Using the word "shall," or, as here, language suggesting the jury will or should impose

the death penalty, is "potentially confusing only in particular circumstances. We must therefore uphold the judgment if satisfied from the individual facts that a reasonable jury could not have been led astray." (*People v. Murtishaw* (1989) 48 Cal.3d 1001, 1030.)

In context, the court made clear during jury selection that the death penalty is *not* mandatory and, largely employing the language we suggested in *Brown*, *supra*, at page 545, footnote 19, stated that the jury was to return a verdict of death only if, after weighing the aggravating and mitigating factors, it found the aggravating factors so substantially outweigh the mitigating factors that death is warranted.

Moreover, the purpose of the explanations during jury selection "was to give prospective jurors, most of whom had little or no familiarity with courts in general and penalty phase death penalty trials in particular, a general idea of the nature of the proceeding." (*People v. Edwards* (1991) 54 Cal.3d 787, 840.) "If defendant wanted the court to give a fuller explanation during jury selection, he should have requested it." (*Id.* at p. 841.) He did not do so.

The court instructed the jury fully after the evidence portion of the penalty phase. Defendant seems to limit his challenge to the instructions during jury selection. But the court also used some problematic language at the end of the trial. At that point, the court instructed the jury, "The weighing of aggravating and mitigating factors does not mean a mere mechanical counting of factors on each side of an imaginary scale or the arbitrary assignment of weights to any of them. You are free to assign whatever moral or sympathetic value you deem appropriate to each and all of the various factors you are permitted to consider. In weighing the various factors, you determine under the relevant evidence which penalty is justified and appropriate by considering the totality of the aggravating factors with the totality of the mitigating factors. To return a judgment of death, each of you

must be persuaded that the aggravating factors are so substantial in comparison with the mitigating factors that it warrants death instead of life without the possibility of parole." This instruction correctly tracked the language we suggested in *Brown*, *supra*, 40 Cal.4th at page 545, footnote 19.

However, the court also instructed, "If, in accordance with the instructions that I have given to you, you consider that the aggravating circumstances outweigh the mitigating circumstances, you shall impose a sentence of death. If, in accordance with the instructions I have given, you determine that the mitigating circumstances outweigh the aggravating circumstances, you shall impose a sentence of confinement in state prison for a term of life without possibility of parole."

The phrasing in this last instruction, "you shall impose a sentence of death," can be misleading if viewed in isolation. "When such instructions have been given without clarification, . . . we must determine based on our review of the entire record, including the instructions as a whole and the argument of counsel, whether the jury may have been misled with respect to its sentencing discretion and responsibilities." (*People v. Clark* (1990) 50 Cal.3d 583, 632.) In context, it is not reasonably likely the jury was misled.

First, the problematic instruction was not given "without clarification." (*People v. Clark*, *supra*, 50 Cal.3d at p. 632.) The court used the clarifying language suggested in *Brown*, *supra*, 40 Cal.4th at page 545, footnote 19, which made clear the jury could impose the death penalty *only* if each juror believed the aggravating factors were so substantial compared to the mitigating factors that death was warranted.

Immediately before the "shall impose a sentence of death" language, the court also instructed, "While the existence of factors in aggravation and mitigation depend upon the evidence, their proper evaluation ultimately requires a normative

54

or moral judgment as to which penalty, death or life without the possibility of parole, should be imposed." This language emphasized the fundamentally subjective nature of the jury's decision and likely tempered any potential confusion the problematic instruction might have caused.

Additionally, the court repeatedly emphasized the normative nature of the jury's decision throughout the closing instructions, not just in the final paragraphs quoted above. It instructed: (1) "The law of the State of California expresses no preference as to which punishment is appropriate. That is for you to determine in accordance with the instructions that I am now giving to you." (2) "Both the People and the defendant have a right to expect that you will consider all of the evidence, follow the law, exercise your discretion conscientiously and reach a just verdict." (3) "A jury in the penalty phase of a capital case is charged with a responsibility different in kind from that of a jury in the culpability phase. Its role is not merely to determine facts, but ultimately to render an individualized, normative and moral determination in accordance with the law set forth in these instructions about the penalty appropriate for the defendant, that is, whether he should live in prison for the rest of his life or be put to death." (4) The jury should consider in mitigation "[a]ny other circumstance which extenuates the gravity of the crime . . . that you find serves as a basis for a sentence less than death." (5) "[Y]ou should also consider and weigh as mitigating . . . any circumstance . . . that suggests that death is not the appropriate penalty or punishment."

Further, because counsel delivered closing arguments after the jury instructions, the trial court's questionable use of the word "shall" was not the last thing the jury heard before deliberations. Counsel for both sides accurately described the jury's task.

55

The prosecutor explained that each juror would have to "individually assign normative or moral values to each fact found. You can decide how much weight to give each fact. What's important to you morally or normatively? What does this mean to you?" She repeatedly reminded the jury of the trial court's statement that the "weighing" of factors was not a "mechanical weighing or calculating." She couched her forceful appeal for a death verdict in language demonstrating the proper legal framework, arguing that there was "only one verdict that's appropriate in this case." The prosecutor never suggested the penalty verdict should result from a deterministic or quantitative reasoning process or that the jury's discretion could be limited by any of their factual findings.

Likewise, defense counsel began by telling the jury that the "awesome responsibility" over defendant's life was "going to get handed off" and "become yours and your alone." He explained that there is "no automatic death penalty," but that the jury would have to "consider everything," and that if there were "any one thing, any one thing that strikes in any of your hearts that appeals to any of your morality about anything relating to Joseph Cordova then you should spare his life. That is your direction." Counsel continually emphasized the normative nature of the jury's decision.

Accordingly, the closing arguments correctly presented the law and consistently reinforced the trial court's proper instructions. After reviewing the entire record, we conclude that the penalty jury was properly informed of its sentencing discretion and the weighing process.

However, once again, we admonish courts to avoid the potentially misleading language the trial court employed here. The death penalty is not mandatory, and the court should avoid any language that might suggest it is mandatory. The court should employ the language suggested in *Brown*, *supra*, 40

56

Cal.3d at page 545, footnote 19, and should not, under any circumstances, add language suggesting that jury "shall" (or will or should) impose the death penalty.

### c. Impact of Execution on the Defendant's Family

During the direct examination of defendant's sister-in-law, Vicki Cordova, defense counsel asked why she did not believe defendant should receive the death penalty. She responded, "Because he has a family who care about him and . . . that would be devastating for the family." The prosecutor objected and asked the comment be stricken. The court instructed the jury to disregard the comment and said, "The impact on defendant's family of the penalty that's imposed is not relevant. You'll disregard that."

The court's instructions to the jury at the end of the evidence portion of the penalty phase included the following: "Sympathy for the family of the defendant, as opposed to defendant himself, is not a matter you can consider in mitigation. Evidence, if any, of the impact of an execution on family members should be disregarded unless and to the extent it illuminates some positive quality of the defendant's background or character."

Defendant contends the court erred in instructing the jury not to consider in mitigation evidence of the impact his execution would have on his family. The Attorney General argues that the claim is forfeited. During the penalty trial, defense counsel recognized that the law was as the court instructed and, accordingly, did not object to the instruction. Instead, he argued that the instruction should include the qualifying language permitting the jury to consider such evidence to the extent it illuminates some quality of defendant's background or character. However, even absent an objection, a defendant may argue an instruction is erroneous "if the substantial rights of the defendant were affected thereby." (§ 1259.) Defendant contends the instruction violated his substantial

57

rights. Accordingly, we will consider the contention on the merits. (*People v. Hillhouse* (2002) 27 Cal.4th 469, 503.)

The contention lacks merit. We have repeatedly upheld this instruction. (*People v. Williams* (2013) 56 Cal.4th 165, 197-198, and cases cited.) Defendant asks us to reconsider these cases, but he presents no good reason to do so. Except as it may illuminate some quality of the defendant's background or character, the impact of execution on the defendant's family is simply irrelevant to the penalty determination. The court did not restrict defendant's ability to present evidence that illuminated his background or character.

### C. Cumulative Prejudice

Defendant contends the cumulative effect of the asserted errors was prejudicial. However, there was no error to accumulate.

### D. Other Contentions

Defendant reiterates several claims we have already rejected. We see no reason to reconsider our previous decisions.

Section 190.2 is not impermissibly broad, and section 190.3, factor (a), does not result in the arbitrary and capricious imposition of the death penalty. (*People v. Avila*, *supra*, 59 Cal.4th at p. 520.) "Except for evidence of other crimes and prior convictions, jurors need not find aggravating factors true beyond a reasonable doubt; no instruction on burden of proof is needed; the jury need not achieve unanimity except for the verdict itself; and written findings are not required." (*People v. Johnson* (2015) 60 Cal.4th 966, 997.) "Intercase proportionality review is not required." (*People v. Rountree* (2013) 56 Cal.4th

823, 862.)[3] "Admission of evidence of prior unadjudicated criminal activity does not violate a defendant's constitutional rights." (*People v. Hartsch* (2010) 49 Cal.4th 472, 515.) "Section 190.3's use of adjectives such as 'extreme' and 'substantial' in describing mitigating circumstances does not impermissibly limit the jury's considerations of mitigating factors." (*Rountree*, at p. 863.) The court is not constitutionally required to inform the jury which of the statutory factors can be considered in aggravation and which can be considered only in mitigation. (*Hartsch*, at p. 516.) (In any event, although it did not have to do so, the court here did instruct the jury that it could consider only factors (a), (b), and (c) of section 190.3 in aggravation, and that it could consider the other factors only in mitigation.) "Prosecutorial discretion in deciding whether or not to seek the death penalty does not create a constitutionally impermissible risk of arbitrary outcomes that differ from county to county." (*People v. Myles* (2012) 53 Cal.4th 1181, 1224.) "The California death penalty scheme does not violate equal protection by treating capital and noncapital defendants differently." (*People v. Livingston* (2012) 53 Cal.4th 1145, 1180.) "Use of the death penalty does not violate international law and is not unconstitutional." (*Ibid.*)

---

[3] We do provide *intracase* proportionality review when requested. Defendant does not specifically request intracase proportionality review, but it would not aid him. Defendant, who had a criminal record, sexually assaulted and brutally murdered an eight-year-old child. He acted alone and was solely responsible for his criminal behavior. The death sentence he received neither shocks the conscience nor is disproportionate to his personal culpability. (*People v. Avila*, *supra*, 59 Cal.4th at p. 520, fn. 4.)

## II. CONCLUSION

We affirm the judgment.

**CHIN, J.**

**WE CONCUR:**

**CANTIL-SAKAUYE, C. J.**
**WERDEGAR, J.**
**CORRIGAN, J.**
**LIU, J.**
**CUÉLLAR, J.**
**KRUGER, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Cordova

_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**


_____

**Opinion No.** S152737
**Date Filed:** October 26, 2015

_____

**Court:** Superior
**County:** Contra Costa
**Judge:** Peter L. Spinetta


_____

**Counsel:**

Glen Niemy, under appointment by the Supreme Court, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gerald A. Engler, Assistant Attorney General, Glenn R. Pruden, Donna M. Provenzano and J. Michael Chamberlain, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Glen Niemy
P.O. Box 3375
Portland, ME  04104
(207) 699-9713

J. Michael Chamberlain
Deputy Attorney General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA  94102-7004
(415) 703-5892