Filed 12/14/21  P. v. Bermudez CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>JOEL NUNEZ BERMUDEZ,<br><br>Defendant and Appellant. | F081814<br><br>(Super. Ct. No. BF167336A)<br><br><br>**OPINION** |

-ooOoo-

### THE COURT[*]

APPEAL from a judgment of the Superior Court of Kern County.  John S. Somers, Judge.

Athena Shudde, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Darren K. Indermill and Kari Ricci Mueller, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

[*]     Before Hill, P. J., Detjen, J. and Snauffer, J.

Defendant Joel Nunez Bermudez stands convicted, following a jury trial, of rape by force or fear and incest. On appeal, defendant contends the trial court erred by admitting evidence of his prior sexual misconduct. The People disagree. We affirm.

## PROCEDURAL SUMMARY

On March 8, 2017,[1] the Kern County District Attorney filed an information charging defendant with rape by force or fear (Pen. Code, § 261, subd. (a)(2); count 1) and incest (Pen. Code, § 285; count 2).

On August 24, 2020, the jury found defendant guilty on both counts.

On September 21, 2020, the trial court sentenced defendant to an aggregate term of eight years as follows: on count 1, eight years (the upper term); and on count 2, three years (the upper term), stayed pursuant to Penal Code section 654.

On the same date, defendant filed a notice of appeal.

## FACTUAL SUMMARY

Defendant was Tressie N.'s ex-husband and the biological father of two of her children, Jane Doe[2] and A.N.[3] In early 2017, Tressie, Jane, A.N., and A.N.'s daughter moved from Texas to Bakersfield and temporarily stayed at defendant's house. Prior to that time, the last time Jane had lived with defendant was when she was approximately one year old.

When the women moved into defendant's house, defendant slept in one room and the women slept in a different room on a pallet made of blankets. On February 14, which was about two or three weeks after they moved in, defendant offered to let Jane sleep in his bed with him if the pallet was too hard for her back. She declined because she did not

---

[1] All further dates refer to the year 2017 except as otherwise noted.

[2] Jane Doe's date of birth was February 18, 1997.

[3] Tressie also referred to a son that she shared with defendant, but he was not named in the record. She also had an older daughter, M.G. Defendant was not M.G.'s biological father.

know defendant well and was not comfortable sleeping in the same bed as him. She told defendant that she was not comfortable sleeping in his bed with him.

Tressie testified that on February 15, the same sleeping arrangement was in place—the women sleeping on the pallet in one bedroom and defendant sleeping on a bed in his own room—except that A.N. was not at home. Tressie, Jane, and A.N.'s daughter all went to bed at the same time, no later than 9:30 p.m.[4]

Jane testified that on February 15, defendant again extended an offer to let her sleep in his bed with him. He told her that "if [she] just wanted to sleep in the bed with him … it would be fine because he[ was her] dad and he would[ not] do anything like that to [her]." When she said, "like that" she meant "[s]exually." Jane "was hesitant and still did[ not] want to" sleep in defendant's bed with him "but [she] wanted to prove [her]self wrong that he wouldn't do anything [sic], so [she] said sure." Jane got into the king-sized bed before defendant, wearing a black tank top and blue sweatpants. About a minute later, defendant got into the bed. He told Jane that she could sleep close to him if she wanted or they could sleep on opposite sides of the bed. Jane fell asleep on the far end of the bed, away from defendant.

That night or early the next morning, Jane woke up when she felt defendant move close to her. He touched her shoulder with his hand and she felt his beard touch her back. Defendant then put his hand under Jane's shirt and touched her breasts. Jane froze and did not say anything because she "was scared and … did[ not] really know exactly what to say because [she] still could[ not] believe that … was happening." Defendant moved closer and began to "hump" Jane while both were clothed. Defendant then reached under her sweatpants and underwear and touched her vagina for one to two minutes. Defendant then moved Jane onto her back by pulling her shoulder toward him. Defendant began to

---

[4] Tressie also testified that Jane regularly "stay[ed] up all night and sle[pt] all day."

pull down his pants, asked Jane if she was a virgin, and called her "mi'ja."[5] Jane responded that she was not. Defendant kissed Jane on her body and pulled off her clothing. Defendant stopped momentarily to grab a condom. He put the condom on and began to have vaginal intercourse with Jane. Soon after defendant began having intercourse with Jane, she said "no … Stop. I don't like this. I don't want this." She said "no" more than one time.[6] Defendant pinned Jane's hands to the headboard and continued to have intercourse with her. Defendant then moved Jane onto her stomach. She did not feel that she could have moved away because he was on top of her. Defendant then moved Jane onto her hands and knees. She did not feel that she could have moved away because defendant was holding her hips. Defendant then moved Jane onto her back. Throughout, Jane was afraid to move away from defendant. At some point during the intercourse, Jane heard her mother call her name and walk around outside of the bedroom. Near the end of the intercourse, defendant asked Jane if she wanted him to ejaculate inside of her. She said "no" and he put on a condom that he retrieved from a dresser drawer in the bedroom.[7]

After defendant left the room, Jane went to the restroom, locked the door, and started crying. She did not know whether to tell someone about what had happened or "bury it away …." She saw that it was 2:00 a.m. and decided to call A.N. because she knew that A.N. was still awake. Jane told A.N. about the rape. She cried as she talked to

---

[5]     Tressie testified that in Spanish "mi'ja" means "my daughter."

[6]     Jane's testimony that she said "no" or "stop" to defendant was impeached with her prior statements to law enforcement that she did not tell him to stop. Ultimately, Jane said that she believed that she told defendant to stop.

[7]     Jane testified both that defendant put a condom on before the intercourse and near the end of the intercourse.

4.

A.N. A.N. told Jane to wake their mother immediately and tell her what had occurred. Jane did so.[8] A.N. called the police and immediately came home.

At some time between 1:00 a.m. and 3:00 a.m. on February 16, Jane woke Tressie. Jane was shaking and crying. She handed Tressie a cell phone and told her that A.N. wanted to talk to her. After Tressie talked to A.N., Tressie confronted defendant on the front porch of the house regarding his having sexually assaulted Jane. Defendant initially told her that nothing happened between he and Jane. Tressie asked him, "If nothing happened, why did she say that" defendant had sex with her. Defendant responded that Jane was "having one of those kind of dreams and touching [him] and rubbing up on [him] and it made [him] feel uncomfortable and [he] got out of bed" and went to the front porch.

Tressie reentered the house and spoke to Jane. Jane's demeanor was the same— she was "[c]rying, shaking, [and] scared to death." Tressie then spoke to defendant again. He admitted that "something did happen" between he and Jane, but he told Tressie "I swear to God, I thought it was you." Tressie testified that she did not sleep in defendant's bed on the night of February 15, but she had slept in his bed on the night of February 14. Tressie had sex with defendant previously but when they had sex, they never used a condom. Tressie testified that defendant had not called her "mi'ja" since 2000, when they became separated. However, the term "mi'ja" was commonly used around the house to refer to Jane and A.N. Tressie also testified that in 2017, she weighed approximately 240 pounds. In the same period, Jane weighed approximately 75 to 100 pounds less than Tressie. After Tressie confronted defendant, he asked her multiple times not to call the police. He suggested that they could go to counseling and

---

**8** Jane also testified that she spoke to her father outside of the house after having left the bathroom. She then reentered the house and went to a vacant bedroom to call A.N. From that bedroom, she then went to wake Tressie at A.N.'s insistence.

" 'work this out as a family.' " A.N. had already called the police to report the incident. When the police arrived, defendant was gone.

On February 16, the women moved into a motel. That day, defendant came to the motel. Tressie had not told defendant where they were; in fact, she had lied and told him that they were staying in a different motel. However, the women had stayed in the motel prior to moving in with defendant and he was able to find them. He told Tressie that he was angry because they had called the police. When A.N. saw defendant in the motel parking lot, she shouted at him and told Tressie to call the police. Defendant told A.N. to be quiet. She did not quiet down, and defendant attempted to hit A.N. in the head, neck or shoulder[9] and then ran away when Tressie began yelling that the police were on their way.

*The Investigation*

In the early morning of February 16, Tressie and Jane went to the police station for interviews. They met with Christina Abshire who was a detective with the Bakersfield Police Department's investigation division and special victims unit. Abshire began her interview of Jane at 5:40 a.m. Jane told Abshire that defendant had sex with her against her will. She told defendant to stop, told him that he could not ejaculate inside of her, and attempted to push him off of her. Defendant "pinned" Jane's arms down and "smashed" her face into the bed. Defendant asked Jane "if she liked it, and she told him no." Defendant did not stop.[10] During the encounter, defendant called Jane "mi'ja" and asked if she was a virgin. Defendant said, if she was a virgin " 'that's hot.' "

Abshire also interviewed Tressie. Tressie confronted defendant about having sex with Jane and defendant responded that he believed he was having sex with Tressie.

---

[9]     Tressie testified that defendant struck A.N. A.N. testified that defendant swung at her but she moved away and he missed.

[10]     On cross-examination, Abshire acknowledged that, in the interview, Jane told her that she did not immediately tell defendant to stop; " 'not until, like, [Tressie] coughed

When he realized it wasn't Tressie, he stopped and exited the room. While Tressie was talking to Abshire, defendant called her. "He said, 'Don't you think I … feel bad for what happened?'"

In the afternoon on the same day, defendant called Abshire on the phone. He told Abshire that he was trying to talk to Tressie and Jane to work out the incident. He described the incident as a family matter and not a police matter. He acknowledged having had sex with Jane, but stated he thought he was having sex with Tressie. He told Abshire that Tressie frequently got up in the middle of the night, came to his bedroom, and had sex with him. Defendant also said that he had not had sex in over a year because he and his girlfriend were separated. Eventually, defendant agreed to meet Abshire at the police station on February 17 at 9:00 a.m.

On February 16, Bakersfield Police Officer Timothy Berchtold conducted a search of defendant's home. In the kitchen, he found a cardboard box lined with a trash bag. Inside the bag was a small orange plastic bag containing a used condom, an open condom wrapper, and an empty cell phone box. Human semen was found inside the condom. Defendant's DNA was found on the inside of the condom and Jane's DNA was found on the outside of the condom.

Defendant did not meet Abshire at the police station on February 17 at 9:00 a.m. On the afternoon of February 17, defendant called Abshire and told her that he would not voluntarily come to the police station. Abshire obtained a search warrant allowing

---

sometime during the [intercourse] and the bed was shaking really loudly,' " did Jane say " 'like, okay. You need to stop.' " At a later part of the interview, Jane said that she had told defendant to stop but he did not stop.

7.

discovery of defendant's location based on his cellular phone data. Undercover officers located and arrested defendant based on that data.

### *The Evidence of Prior Sexual Misconduct*

M.G. is Tressie's daughter. Defendant is not her biological father, but she lived with defendant for a time while he was married to her mother. M.G. ceased living with defendant when she was six years old. M.G. described defendant having touched her vagina on more than one occasion when she lived with him.

## DISCUSSION

Defendant challenges the trial court's admission of evidence of his prior misconduct toward M.G. under Evidence Code section 1108.[11] Section 1108, subdivision (a), provides an exception to section 1101, subdivision (a)—which generally precludes the admission of evidence of specific incidents of prior misconduct to prove a defendant's propensity to engage in such misconduct—for prior sexual misconduct when a defendant is charged with a sexual offense. Admission of evidence pursuant to section 1108 requires a trial court to exclude the evidence, pursuant to section 352, if the probative value of the evidence is substantially outweighed by the probability that its admission will necessitate undue consumption of time, cause undue prejudice, confuse the issues, or mislead the jury. Defendant contends the trial court abused its discretion in admitting the evidence pursuant to section 1108 because the prior misconduct was dissimilar from the charged offenses, remote in time, more inflammatory because it involved a minor, and was likely to confuse the jury. The People disagree, as do we.

### A. Background

The People gave notice before trial of their intent to present evidence of defendant's prior misconduct toward M.G. and another victim, B.S. The People characterized the evidence of defendant's sexual misconduct toward M.G. as follows:

---

[11] All further statutory references are to the Evidence Code unless otherwise stated.

In 1994, "[M.G.] was sleeping [in] the bed with her mother and the defendant and some siblings.  In the morning her mother and siblings left the bed at which time the defendant reached into her underwear, touched her vagina and inserted his finger into her vagina.  The defendant then told her 'Don't tell your mom or I'll hurt you[.]' "

The People characterized the evidence of defendant's sexual misconduct toward B.S. as follows:

"In 2009[, B.S.] reported that he[r] step[-]father at the time[, defendant,] had sexually assaulted her three separate times between the ages of [nine and] 11.  During one of the incidents B.S. was asleep on the couch when she woke up to the defendant with his hands inside of her pants and underwear[;] during this incident she stated that the defendant partially inserted his finger into her vagina.

"During the second incident[, B.S.] was sleeping in her parents['] bedroom when she again woke up to the defendant with his hand inside of her pants and underwear.  During this incident the defendant kept his hand inside of her underwear for approximately one minute.

"During the third incident[, B.S.] was laying on the floor when the defendant again put his hand inside of her underwear and touched her vagina."

After hearing the parties' arguments, the trial court explained its ruling.  It concluded that the alleged prior incidents of misconduct would constitute sexual offenses, if true.  It explained that the primary question before it was whether the evidence was unduly prejudicial under section 352.  It concluded that the evidence of prior misconduct was very similar to the charged offenses, which lessened the probability of undue prejudice.  All of the incidents allegedly "took place while the alleged victims were sleeping or at least in bed"; "[t]here was … essentially a parent/child relationship[] between … defendant and each of the three young ladies"; and the comments defendant made "to the alleged victims [were] also fairly similar in each of these cases."  Even though B.S. and M.G. were minors when the alleged prior misconduct took place and Jane was a young adult, the court concluded that the similarity of defendant's conduct

9.

and the relationships between defendant and the victims were such that the probative value outweighed the risk of undue prejudice.

Second, the trial court explained that while sexual misconduct against minors is generally very inflammatory, those allegations were not substantially different in nature from those at bar. Also tending to limit the inflammatory impact, both of the alleged prior incidents of misconduct involved touching rather than intercourse. The trial court concluded that the events involving Jane were the "most serious of the three."

Third, the trial court concluded that, although the events had taken place many years ago (approximately 23 years earlier as to M.G.), the fact that multiple incidents took place with M.G. and B.S. suggested that the remoteness did not significantly limit the probative value of the evidence.

Considering all of those factors, the trial court concluded that the probative value of the evidence outweighed the potential for undue prejudice. In order to limit any risk that the jury might punish defendant for prior misconduct, the trial court prohibited the prosecutor from eliciting testimony regarding whether the prior misconduct resulted in any conviction or punishment. The court explained that its limitation did not preclude the prosecutor from eliciting testimony regarding whether the prior misconduct was reported to law enforcement at the time. Such testimony, the court reasoned, would support the credibility of the claims of prior misconduct.

**B. Standard of Review**

Section 1101 is the general rule that governs admissibility of character evidence, including evidence of prior misconduct. It provides that character evidence, including "specific instances of [a person's] conduct," is generally "inadmissible when offered to prove [that person's] conduct on a specified occasion" or "disposition to commit" a crime or other wrongful act. (§ 1101, subds. (a) & (b).)

Before the enactment of section 1108, evidence of a defendant's prior sexual offenses, like other prior misconduct evidence, was generally inadmissible under

10.

section 1101. (See former § 1101, subd. (a), as amended by Stats. 1986, ch. 1432, § 1.) But in 1995, the Legislature enacted section 1108 to expand the admissibility of this type of evidence in sex offense cases. (§ 1108, subd. (a) ["In a criminal action finding in which the defendant is accused of a sexual offense, evidence of the defendant's commission of another sexual offense or offenses is not made inadmissible by [s]ection 1101, if the evidence is not inadmissible pursuant to [s]ection 352."]; *People v. Falsetta* (1999) 21 Cal.4th 903, 911 (*Falsetta*).) Section 1108 "allows evidence of the defendant's uncharged sex crimes to be introduced in a sex offense prosecution to demonstrate the defendant's disposition to commit such crimes." (*People v. Reliford* (2003) 29 Cal.4th 1007, 1009.)

For evidence of prior misconduct to be admissible under section 1108, (1) the defendant must currently be charged with a sexual offense, (2) the trial court must make a preliminary factual determination that the prior misconduct constitutes a "sexual offense" as defined by the statute, and (3) the evidence must not be otherwise inadmissible pursuant to section 352. (§ 1108, subd. (a); *People v. Cottone* (2013) 57 Cal.4th 269, 281 (*Cottone*).)

As defined by section 1108, and as relevant here, a "sexual offense" includes rape (§ 1108, subd. (d)(1)(A); Pen. Code, § 261), lewd or lascivious acts upon the body of a child under the age of 14 (§ 1108, subd. (d)(1)(A); Pen. Code, § 288), and "[c]ontact, without consent, between any part of the defendant's body or an object and the genitals or anus of another person," (§ 1108, subd. (d)(1)(C)).[12] A trial court makes findings of

---

[12] Section 1108, subdivision (d)(1) provides: " '[s]exual offense' means a crime under the law of a state or of the United States that involved any of the following: [¶] (A) Any conduct proscribed by subdivision (b) or (c) of [s]ection 236.1, [s]ection 243.4, 261, 261.5, 262, 264.1, 266c, 269, 286, 287, 288, 288.2, 288.5, or 289, or subdivision (b), (c), or (d) of [s]ection 311.2 or [s]ection 311.3, 311.4, 311.10, 311.11, 314, or 647.6 of, or former [s]ection 288a of, the Penal Code. [¶] (B) Any conduct proscribed by [s]ection 220 of the Penal Code, except assault with intent to commit mayhem. [¶] (C) Contact, without consent, between any part of the defendant's body or an object and

preliminary fact to determine whether the prior misconduct constitutes a "sexual offense" by a preponderance of the evidence. (§ 405; *Cottone*, *supra*, 57 Cal.4th at pp. 283, 285–286 ["when a defendant objects to the admission of [section] 1108 evidence on the ground that the conduct does not amount to a crime, the court reviews any preliminary fact necessary to that determination under section 405"]; see *Cottone*, at p. 289 [trial court's determination of a preliminary fact under § 405 is final and is not revisited by the jury].)

If the prior misconduct constitutes a "sexual offense," the trial court applies section 352 to balance the probative value of the prior misconduct evidence against the "probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (§ 352; see § 1101, subd. (a); § 1108, subd. (a); *Falsetta*, *supra*, 21 Cal.4th at p. 911.) Five factors are "particularly significant" in an Evidence Code section 1108 analysis: "(1) whether the propensity evidence has probative value, e.g., whether the uncharged conduct is similar enough to the charged behavior to tend to show the defendant did in fact commit the charged offense; (2) whether the propensity evidence is stronger and more inflammatory than evidence of the defendant's charged acts; (3) whether the uncharged conduct is remote or stale; (4) whether the propensity evidence is likely to confuse or distract the jurors from their main inquiry, e.g., whether the jury might be tempted to punish the defendant for his uncharged, unpunished conduct; and (5) whether admission of the propensity evidence will require an undue consumption of time." (*People v. Nguyen* (2010) 184 Cal.App.4th 1096, 1117.) Under section 1108, prior misconduct "evidence is presumed admissible and is to be excluded [under

the genitals or anus of another person. [¶] (D) Contact, without consent, between the genitals or anus of the defendant and any part of another person's body. [¶] (E) Deriving sexual pleasure or gratification from the infliction of death, bodily injury, or physical pain on another person. [¶] (F) An attempt or conspiracy to engage in conduct described in this paragraph."

section 352] only if its prejudicial effect substantially outweighs its probative value in showing the defendant's disposition to commit the charged sex offense or other relevant matters." (*People v. Cordova* (2015) 62 Cal.4th 104, 132 (*Cordova*).)

We review the trial court's findings of preliminary fact for substantial evidence (*Jutzi v. County of Los Angeles* (1987) 196 Cal.App.3d 637, 647–648), and we review the court's decision not to exclude evidence under section 352, in addition to its ultimate decision to admit prior sexual misconduct evidence under section 1108, for abuse of discretion. (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9–10; *Cordova*, *supra*, 62 Cal.4th at p. 132.) A trial court abuses its discretion when its ruling falls outside the bounds of reason. (*People v. Benavides* (2005) 35 Cal.4th 69, 88.)

### C. Analysis

#### 1. *The Prior Uncharged Misconduct and at Least One Charged Offense Were Sexual Offenses*

The incidents of prior uncharged misconduct—touching M.G. and B.S.'s genitals—were sexual offenses within the meaning of section 1108 (§ 1108, subd. (d)(1)(C)), as was the rape charged in the matter before us (§ 1108, subd. (d)(1)(A); Pen. Code, § 261). The trial court's conclusion that the prior and present offenses were sexual offenses was supported by substantial evidence.

#### 2. *Section 352 Did Not Require Exclusion of the Prior Uncharged Misconduct*

Defendant contends the trial court should have excluded the prior misconduct evidence under section 352. He raises five reasons.

First, defendant argues the prior misconduct evidence was not probative of his disposition to commit the charged offenses because the prior offenses were not similar to the charged offenses. We disagree. The prior misconduct evidence was very probative of defendant's propensity to commit the charged offenses because it was a prior sexual offense (*Falsetta*, *supra*, 21 Cal.4th at p. 912) and because it was similar to the charged

13.

offenses.[13] In each instance, defendant had some father/daughter relationship with the victim, approached the victim while she was sleeping or in bed, and touched her genitals. Moreover, while M.G. was only six years old at the time of the prior sexual misconduct, Jane was also a young woman of 19 years of age at the time of the offense in this case. Based on a comparison of the prior misconduct and the charged offenses, the trial court reasonably concluded that the cases were "fairly similar," albeit "not identical." The disparity in the age of the victims was not dispositive in light of the similarities. (*People v. Escudero* (2010) 183 Cal.App.4th 302, 311.)

Second, defendant argues the prior misconduct evidence was not probative of his disposition to commit rape because the prior misconduct only involved touching (and perhaps digital penetration). Again, we disagree. As previously discussed, there was good reason for the trial court to conclude defendant's misconduct toward the prior victims was similar. More to the point, as we discussed above, commission of a sexual offense is probative of a disposition to commit other sexual offenses. (*Falsetta*, *supra*, 21 Cal.4th at p. 912.)[14] His prior sexual misconduct against those with whom he had a father/daughter relationship was probative of his disposition to commit the charged sexual offenses against Jane.

Third, defendant contends that the uncharged misconduct was significantly remote, which eliminated any tendency for the evidence to show that defendant had a propensity to commit the charged offense. We disagree. " 'No specific time limits have

---

[13] We note that prior sexual offenses need not be similar to charged offenses to be admitted pursuant to section 1108. (*Cordova*, *supra*, 62 Cal.4th. at p. 133.) However, similarity is relevant to a trial court in exercising its discretion pursuant to section 352. (*Cordova*, at p. 133.)

[14] Although the evidence was not admitted under section 1101, we note that it was probative for many of the purposes articulated in section 1101, subdivision (b). Specifically, it was probative of defendant's plan or the absence of mistake in defendant having intercourse with Jane rather than Tressie.

14.

been established for determining when an uncharged offense is so remote as to be inadmissible.' [Citation.] ' "[S]ubstantial similarities between the prior and the charged offenses balance out the remoteness of the prior offenses." ' " (*People v. Robertson* (2012) 208 Cal.App.4th 965, 992 [no error in admitting 34-year-old prior sexual assault conviction]; *People v. Pierce* (2002) 104 Cal.App.4th 893, 900 [sex crime committed 23 years before current crime was admissible]; *People v. Branch* (2001) 91 Cal.App.4th 274, 284–285 [upholding admission of a sex crime committed 30 years before charged offense].) While the prior incidents of sexual misconduct were remote (23 years prior as to M.G.), they were not so remote as to be not at all probative in light of the similarities to the charged offenses. Further, as the trial court correctly noted, the fact that the prior incidents of sexual misconduct were repeated and involved two victims tended to support the validity of the propensity inference, despite the age of the misconduct. (See *People v. Dworak* (2021) 11 Cal.5th 881, 901 [the staleness of prior misconduct is generally only relevant if the defendant has led a blameless life in the interim].)

Fourth, defendant contends the prior misconduct was more inflammatory than the charged rape because the prior misconduct involved alleged sexual touching of a child. Sexual touching of a minor stepchild is certainly egregious conduct. However, we cannot conclude that the trial court erred in concluding that it was not particularly inflammatory when compared against the rape of a biological young adult child. Indeed, the actual testimony was very brief and " 'no stronger and no more inflammatory than the testimony concerning the charged offenses.' " (*People v. Eubanks* (2011) 53 Cal.4th 110, 144.) Further, the trial court excluded any testimony regarding conviction or punishment for the incidents of prior sexual misconduct to limit the risk of the jury punishing defendant for his prior misconduct.

And fifth, defendant contends that the jury was probably confused by M.G.'s statement that she "only spoke of one incident." We disagree. In context, M.G.'s

15.

statement suggested that she only reported or told someone about one incident of sexual touching.[15]

In sum, nothing about the evidence here required the trial court to find the presumption in favor of admissibility had been overcome. We therefore conclude the trial court did not abuse its discretion in deciding not to exclude the prior misconduct evidence under section 352.

## DISPOSITION

The judgment is affirmed.

---

[15]   The exchange reads as follows:

"Q. Do you remember if the [d]efendant ever put his hands or fingers inside of your vagina?
"A. I cannot recall. I know that there were several occasions. [¶] … [¶] But there are[—]there were two or three occasions I know. But because I cannot recall them because I've—they are really hazy, I only spoke of one incident and of that incident I know that he touched me. I don't know that there was any sort of insertion of any kind."